656 F.2d 820
 211 U.S.App.D.C. 231, 81-2 USTC P 9504
 Inez WRIGHT, Individually and on Behalf of Her Minor
Children, Oscar Clay Renfro, Anthony Lee Renfro,
Lisa Marie Wright, and Ephron Antoni
Wright, Jr., et al., Appellants,
v.
Donald T. REGAN, Secretary of the Treasury, et al.
 No. 80-1124.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 17, 1981.
Decided June 18, 1981.
 
 Appeal from the United States District Court for the District of Columbia (Civil Action No. 76-1426).
 Robert H. Kapp, Washington, D. C., with whom Arthur J. Rothkopf, Sara-Ann Determan, Paul L. Joffe, Washington, D. C., Richard S. Kohn, Philadelphia, Pa., William L. Robinson, Norman J. Chachkin, New York City, William E. Caldwell, Richard Fields, Memphis, Tenn., James M. Nabrit, III, Bill Lann Lee, New York City and Armand G. Derfner, Charleston, S. C., were on the brief for appellants. Frank R. Parker, Jackson, Miss., for appellants.
 Robert S. Pomerance, Atty., Dept. of Justice, Washington, D. C., with whom M. Carr Ferguson, Asst. Atty. Gen., Washington, D. C. (at the time the brief was filed), John F. Murray, Acting Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., Michael L. Paup and Ernest J. Brown, Attys., Dept. of Justice, Washington, D. C., were on the brief, for federal appellees. William A. Friedlander, Atty., Dept. of Justice, Washington, D. C., for federal appellees.
 George E. Morrow, Memphis, Tenn., for appellee Allen.
 Before WRIGHT, TAMM and GINSBURG, Circuit Judges.
 Opinion for the court filed by Circuit Judge GINSBURG.
 Dissenting opinion filed by Circuit Judge TAMM.
 GINSBURG, Circuit Judge:
 
 
 1
 This action charges the Internal Revenue Service with failure to fulfill its obligation to confine tax exemption under section 501(c)(3) of the Internal Revenue Code to private schools that operate on a racially nondiscriminatory basis.[1] It was initiated in 1976 by parents of black children attending public schools in desegregating districts in several states. Nationwide relief is sought. The case is companion to Green v. Miller, No. 1355-69 (D.D.C.). Green was instituted in 1969 and reopened in 1976; relief requested in Green is limited to schools in Mississippi. In April 1977 the district court ordered the two actions consolidated. Green v. Miller, No. 1355-69 (D.D.C. Apr. 5, 1977), Joint Appendix (J.A.) 48-50. In November 1979 that court dismissed the Wright component of the consolidated action as nonjusticiable. Wright v. Miller, 480 F.Supp. 790 (D.D.C.1979). Six months later, the district court issued an order and permanent injunction in Green granting in significant part the relief requested in that action. Green v. Miller, No. 1355-69 (D.D.C. May 5, 1980) (clarified and amended June 2, 1980).
 
 
 2
 In this appeal plaintiffs' standing to sue is the dominant issue. In addition to concluding that plaintiffs lacked standing, the district court also determined that deference to the Internal Revenue Service and to Congress portended against judicial review. We conclude that the district court erred in dismissing the case on the grounds asserted; we therefore remand for further proceedings.[2] To place the issues before us in context, we describe at the outset the course of proceedings, first in Green, then in this case. Thereafter, we discuss in turn the three reasons the district court supplied for dismissing the complaint.
 
 I. THE GREEN AND WRIGHT CASE HISTORIES
 
 3
 In 1969, when the Green litigation commenced, the IRS accorded tax-exempt status to racially discriminatory private schools so long as the schools were not receiving state aid. See Green v. Kennedy, 309 F.Supp. 1127, 1130 (D.D.C) (three-judge court), appeal dismissed sub nom. Cannon v. Green, 398 U.S. 956, 90 S.Ct. 2169, 26 L.Ed.2d 539 (1970); Hearings, supra note 1, at 3 (statement of Jerome Kurtz, Commissioner of Internal Revenue). The Green plaintiffs, black parents and their minor children attending public schools in Mississippi, sought to enjoin the Secretary of the Treasury and the Commissioner of Internal Revenue from according tax exemption to private schools in Mississippi "from which Negro students are excluded on the basis of color." 309 F.Supp. at 1130. In response to the plaintiffs' motion for a preliminary injunction, the three-judge district court empaneled to hear Green[3] restrained the defendants "from issuing further ruling letters under sections 170(c) and 501(c) of the Internal Revenue Code to private schools in Mississippi unless they have affirmatively determined on the basis of adequate investigation that the applicant school does not discriminate against Negroes in its admissions policy." 309 F.Supp. at 1131. Before setting out the considerations that warranted pendente lite injunctive relief, the court dealt summarily with the defendants' assertion that the plaintiffs lacked standing to maintain the suit:
 
 
 4
 We take note of defendants' contention that plaintiffs have no standing to bring this action in their capacity as taxpayers. We need not consider that issue at this juncture. This case is properly maintained as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, by Negro school children in Mississippi and the parents of those children on behalf of themselves and all persons similarly situated. They have standing to attack the constitutionality of statutory provisions which they claim provides (sic ) an unconstitutional system of benefits and matching grants that fosters and supports a system of segregated private schools as an alternative available to white students seeking to avoid desegregated public schools.
 
 
 5
 Id. at 1132.
 
 
 6
 Prior to further disposition by the court, the Service changed its position. It announced that racially discriminatory private schools are not entitled to tax exemption.[4] A sharp adversary contest remained, however, between plaintiffs and intervenors, a class of parents and children who supported or attended private schools in Mississippi with an enrollment limited to members of the white race. See Green v. Connally, 330 F.Supp. 1150, 1155 (D.D.C.) (three-judge court), aff'd mem. sub nom. Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971).
 
 
 7
 In June 1971, the court decided Green on the merits; granting plaintiffs both declaratory relief and a permanent injunction, the court held that "the Code requires the denial and elimination of Federal tax exemptions for racially discriminatory private schools and of Federal income tax deductions for contributions to such schools." Green v. Connally, 330 F.Supp. at 1156. The court noted that section 501(c)(3) does not expressly so mandate. It then discussed evolving case law governing charitable and educational trusts. Ultimately, however, the court did not rest upon common-law developments. Instead, it determined that the Internal Revenue Code exemption provisions must be read in a manner harmonious with federal civil rights legislation and the overriding national policy against racial discrimination in educational facilities. A contrary reading, the court emphasized, would raise "serious constitutional questions":
 
 
 8
 Clearly the Federal Government could not under the Constitution give direct financial aid to schools practicing racial discrimination. But tax exemptions and deductions certainly constitute a Federal Government benefit and support. While that support is indirect, and is in the nature of a matching grant rather than an unconditional grant, it would be difficult indeed to establish that such support can be provided consistently with the Constitution.
 
 330 F.Supp. at 1164-65.[5]
 
 9
 The injunction ordered in Green in June 1971 barred the Service from granting tax exemption to any private school in Mississippi unless the school adopted a racially nondiscriminatory policy as to students and gave meaningful notice to the community concerning that policy. Further, the injunction required schools seeking exemption to supply the Service with information as to (1) the racial composition of students, faculty, staff, and applicants for admission; (2) recipients of scholarship and loan funds; and (3) the school's organizers, board members, and donors of land and buildings. 330 F.Supp. at 1179-80. The nature of the class action, the court noted, accounted for a decree limited to schools in Mississippi. The court added, however, that "(t)he Service would be within its authority in including similar requirements for all schools of the nation." Id. at 1176. More particularly, the court stated:
 
 
 10
 To obviate any possible confusion the court is not to be misunderstood as laying down a special rule for schools located in Mississippi. The underlying principle is broader, and is applicable to schools outside Mississippi with the same or similar badge of doubt. Our decree is limited to schools in Mississippi because this is an action in behalf of black children and parents in Mississippi ....
 
 
 11
 Id. at 1174.
 
 
 12
 After the Supreme Court summarily affirmed the three-judge district court decision in Green v. Connally,[6] the Service adopted guidelines, applicable nationwide, to assist it in determining whether schools seeking or holding exempt status are in fact discriminatory.[7] The IRS guidelines, as published in 1975, were criticized by the U.S. Commission on Civil Rights as inadequate to identify racially discriminatory schools.[8] Ultimately, the Service acknowledged that the procedures in place since 1975 were "ineffective in identifying schools which in actual operation discriminate against minority students, even though the schools may profess an open enrollment policy and comply with the (IRS) yearly publication requirement."[9]
 
 
 13
 On July 23, 1976, the Green plaintiffs reopened that case, asserting that the Service was not complying with the court's continuing injunction against tax exemption for racially discriminatory private schools in Mississippi. In particular, the plaintiffs sought to compel the Service to withdraw tax-exempt status from, and refuse to grant it to,
 
 
 14
 all Mississippi private schools or the organizations which operate them, which:
 
 
 15
 (1) have been determined in adversary judicial or administrative proceedings to be racially discriminatory; or
 
 
 16
 (2) which have insubstantial minority enrollments, which are located in or serve desegregating public school districts, and which either (i) were established or expanded at or about the time the public school districts in which they are located or which they serve were desegregating, or (ii) cannot demonstrate that they do not provide racially segregated educational opportunities for white children avoiding attendance in desegregating public school systems.[10]
 
 
 17
 One week later, this action commenced. Inez Wright, the mother of four black children attending public schools in Memphis, Tennessee, and a number of other similarly situated parents in eight states across the country filed a complaint in the district court, individually, on behalf of their minor children, and as representatives of a class, seeking relief on a nationwide basis similar to that sought with respect to Mississippi in the reopened Green case. Complaint at 3-4, J.A. 11-12. In April 1977, on motion of plaintiffs in both cases, the court consolidated the Green and Wright actions "inasmuch as (they) involve common questions of law and fact." J.A. 49. This action then became known as the "Wright component" of the consolidated proceedings. In May 1977, W. Wayne Allen, Chairman of the Board of Trustees of the Briarcrest School System in Memphis, was granted leave to intervene in Wright. Intervenor Allen pointed out that Briarcrest was one of the private schools specifically mentioned in the Wright complaint as a "segregated academy." He participated in Wright as a parent who has chosen to send his children to Briarcrest and as a contributor to that private school system who deducts the contributions on his federal income tax returns. J.A. 41-44; Brief for Intervenor-Appellee at 5-6.
 
 
 18
 Prompted by the Green and Wright lawsuits, the Service reviewed its procedures and concluded that more specific guidelines were needed to determine whether the "actual practice" of certain schools "conformed to their asserted policies."[11] In August 1978, the Service published proposed new procedures for review of a school's racial policy.[12] After receiving written comments and conducting public hearings on the proposal, the Service, in February 1979, published a revised version.[13] The proposed guidelines, as revised, deal primarily with two classes of private elementary and secondary schools those adjudicated discriminatory in nontax cases, and those with insignificant minority enrollment whose formation or substantial expansion is related to public school desegregation in the community.[14] Such schools "would have been required to make special showings to rebut the indications of racial discrimination."[15]
 
 
 19
 Effective October 1, 1979, further IRS action was stayed by Congress through amendments to the Treasury Appropriations Act of 1980.[16] Two riders deal with the issue. One, known as the Dornan amendment,[17] deals specifically with the IRS guidelines proposed in August 1978 and February 1979; it provides that "(n)one of the funds available under (the) Act may be used to carry out (the IRS proposals)." The other, known as the Ashbrook amendment,[18] provides more generally that none of the funds furnished pursuant to the Act shall be used for measures, other than those then in effect, that "would cause the loss of tax-exempt status to private, religious, or church-operated schools."[19]
 
 
 20
 Thereafter, on November 26, 1979, the district judge dismissed this action, the Wright component of the consolidated proceedings, stating three grounds, each sufficient in his judgment to warrant the dismissal: first, the Wright plaintiffs lacked standing; second, the action was barred by "the doctrine of nonreviewability"; third, granting the relief requested by the Wright plaintiffs would thwart the express will of Congress, manifest in the Ashbrook and Dornan amendments. Wright v. Miller, 480 F.Supp. 790 (D.D.C.1979). The same district judge, six months later, entered an order in favor of the plaintiffs in Green. The court enjoined the Service from granting tax-exempt status to Mississippi private schools (1) adjudged to be racially discriminatory or (2) established or expanded at the time of local public school desegregation, unless the schools clearly and convincingly demonstrate that "they do not racially discriminate in admissions, employment, scholarships, loan programs, athletics, and extra-curricular programs." Green v. Miller, No. 1355-69 (D.D.C. May 5, 1980) (clarified and amended June 2, 1980).
 
 
 21
 The district judge did not supplement his order in Green with an opinion reconciling that decree with his dismissal of the Wright complaint. Both sets of plaintiffs sought review of the same agency action (or inaction). The will of Congress, we believe, does not separate Mississippi from the rest of the nation. An objection to standing, raised when Green was reopened, was denied without opinion.[20] While only the Wright component is before us for review, we note the anomalous result of the district court rulings in the two cases. To obey both court decree and congressional stop order, the Service must apply one set of guidelines to schools in Mississippi and another, less stringent set of procedures to schools outside Mississippi, even schools bearing "the same or similar badge of doubt."[21]II. PLAINTIFFS HAVE STANDING TO SUE
 
 A. The District Court's Position
 
 22
 The district court determined that standing in this case depended on satisfaction of four criteria and that plaintiffs satisfied none of them. First, the court said, plaintiffs asserted no "distinct, palpable, and concrete injury." 480 F.Supp. at 793. Nor could plaintiffs establish such an injury, according to the district court, for they were "in a dilemma":
 
 
 23
 If plaintiffs can prove that a private school is discriminating in direct contravention of the Constitution and federal law, such discrimination is redressable through an ordinary lawsuit in an adversary context filed directly against the offending school. If, on the other hand, plaintiffs cannot prove such discrimination, they have failed to assert a distinct, palpable, and concrete injury and thus lack the requisite standing to assert their claims.
 
 
 24
 Id. at 794. Plaintiffs urge that this analysis fits a complaint they did not bring. They maintain they have no interest whatever in enrolling their children in a private school. They assail only government action. The sole injury they claim is the denigration they suffer as black parents and schoolchildren when their government graces with tax-exempt status educational institutions in their communities that treat members of their race as persons of lesser worth. Plaintiffs point out that the district court cited, but did not purport to distinguish, Supreme Court decisions recognizing the standing of black citizens, parents, and schoolchildren to challenge government action on that basis: Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971), aff'g mem. Green v. Connally, 330 F.Supp. 1150 (D.D.C.); Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973); and Gilmore v. City of Montgomery, 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974).
 
 
 25
 Second, assuming the injury plaintiffs complained of was inflicted by private schools that practiced race discrimination, the court concluded that such an injury was not "fairly traceable" to IRS action. For this conclusion, the court relied dominantly on Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Again, plaintiffs insist, the court misidentified their grievance. Eastern Kentucky might well control, they concede, were they endeavoring to gain access to the private schools. But that is not what they want. Rather, plaintiffs repeat, they seek to stop government from bestowing any advantage on an educational facility that contributes to the perpetuation of racial discrimination in the localities in which they reside.
 
 
 26
 Third, the district court stated that it was "purely speculative" whether the relief requested would redress plaintiffs' injury. 480 F.Supp. at 795-96. The loss of tax exemption might not produce any net change in the public school population; schools might forego exemption rather than end any discriminatory conduct; the procedures plaintiffs proposed might not yield fewer tax exemptions than the system the IRS now employs. Regarding the first two points, once more, plaintiffs say, the injury they assert is not the one the district court describes. The very act by the IRS of according tax exemption to a school that discriminates in their vicinity causes immediate injury to them, plaintiffs maintain, and that is the only injury for which they seek redress.
 
 
 27
 Concerning the likelihood that invigorated IRS procedures would yield fewer tax exemptions, plaintiffs point out that the district court's dismissal of the case at the threshold precluded any evidentiary submission. They further note that the Commissioner of Internal Revenue had told Congress that existing procedures were "ineffective in identifying schools which in actual operation discriminate against minority students." Hearings, supra note 1, at 5. Finally, they suggest that the court's action in Green contradicts its conclusion in Wright about the "speculativeness" of the relief requested. If tighter IRS procedures are not likely to yield fewer tax exemptions, plaintiffs note, it is hard to imagine why the court ordered the Service to adopt such procedures in Green.
 
 
 28
 As a final point, the district court expressed the view that no genuine article III case or controversy existed because the defendant IRS "seems to have nothing to lose if it were forced to grant less tax exemptions to private schools." 480 F.Supp. at 796. The real losers, the court said, would be parties the plaintiffs had not sued, schools "(p)laintiffs would deprive ... of their valuable tax exempt status." Id. Plaintiffs and the Service, the court added, "seem closely allied in terms of the need to promulgate future guidelines." Id. But it was the IRS that defended successfully against this action in the district court. Nor did the Service exhibit any lack of adversary zeal in the briefs and oral argument it presented to this court. Moreover, a strong advocate of the private schools that resist more stringent guidelines is participating in this action as intervenor. We therefore find that the case has the earmarks of a fully adversary contest.
 
 
 29
 On this point too, Green stands in jarring contrast. The posture of the IRS is not different in the two cases. While intervenors originally participated in Green and indeed pursued that case in the Supreme Court, no intervenor appears to have participated actively in the reopened Green proceeding as intervenor Allen did in Wright. Nevertheless, the district court treated Green as a genuine case or controversy and, as we recounted earlier, required the Service to tighten its procedures in dealing with Mississippi schools.
 
 
 30
 B. Divergent Supreme Court Precedent : Eastern Kentucky on the one hand ; Green, Norwood, and Gilmore on the other
 
 
 31
 The law of standing has been described as "extraordinarily uneven."[22] In the welter and confusion of case law and commentary, there is one point of clear agreement: "(L)ower courts and practitioners especially need Supreme Court guidance."[23] The guidance the High Court has supplied relevant to the case at hand points in opposite directions. Simon v. Eastern Kentucky Welfare Rights Organization, relied upon by the district court, suggests that litigation concerning tax liability is a matter between taxpayer and IRS, with the door barely ajar for third party challenges. Green, Norwood, and Gilmore, on the other hand, indicate that black citizens have standing to complain against government action alleged to give aid or comfort to private schools practicing race discrimination in their communities.
 
 
 32
 In this opinion, we do not search for a grand solution that will unclutter this area of the law and lead to secure, evenhanded adjudication. Instead, as an intermediate court of review, we select from two divergent lines of Supreme Court decision the one we believe best fits the case before us.
 
 
 33
 We turn first to Eastern Kentucky. There indigents and organizations of indigents challenged a Revenue Ruling discontinuing a requirement that a hospital, to be classified as "charitable" under section 501(c)(3), must provide free or below cost service to indigents to the extent of its financial ability. After the new Ruling, some of the plaintiffs had been denied hospital services on account of their indigency. The Supreme Court held that plaintiffs lacked standing to bring the suit.
 
 
 34
 Plaintiffs' injury, the Court said, was the denial of hospital service. But plaintiffs could not show that the hospitals' refusal to serve them resulted from the Ruling. "It is purely speculative," the Court declared, "whether the denials of service specified in the complaint fairly can be traced to (the Ruling) or instead result from decisions made by the hospitals without regard to the tax implications." 426 U.S. at 42-43, 96 S.Ct. at 1926-1927. Justice Stewart, concurring, commented: "I cannot now imagine a case, at least outside the First Amendment area, where a person whose own tax liability was not affected ever could have standing to litigate the federal tax liability of someone else." Id. at 46, 96 S.Ct. at 1928.[24]
 
 
 35
 Plaintiffs do not dispute that it is "speculative," within the Eastern Kentucky frame, whether any private school would welcome blacks in order to retain tax exemption[25] or would relinquish exemption to retain current practices.[26] They claim indifference as to the course private schools would take. Plaintiffs strenuously argue, however, that Eastern Kentucky is the wrong frame for their case. They assert, in essence, that there is at least one domain "outside the First Amendment area" where a person whose own tax liability is not affected has the requisite standing to challenge the administration of tax law, and that this lawsuit occupies that domain. We agree that Eastern Kentucky is not the line appropriately followed in the matter before us.
 
 
 36
 We turn next to the three adjudications that appear to us determinative of the standing issue in this case: the companion Green litigation; Norwood v. Harrison ; and Gilmore v. City of Montgomery. All three involved, in common with the matter before us, charges of government conduct alleged to be inconsistent with an overriding, constitutionally rooted national policy against racial discrimination in United States educational facilities. Again in line with the instant case, none involved a claim for relief against private actors.
 
 
 37
 As we set out earlier, see pp. 822, 823, 825, 826, 827 supra, the plaintiffs in Green, like those in Wright, are black parents and their minor schoolchildren attending public schools in desegregating areas; in both cases, the plaintiffs charged that the Internal Revenue Service has failed, through the inadequacy of its monitoring procedures, to confine tax-exempt status to private schools that do not practice racial discrimination. The remedy sought in the two cases, except for its geographical scope, is the same the institution of procedures adequate to the task. That remedy, plaintiffs in both cases assert, matches precisely the injury they allege.
 
 
 38
 Norwood, like Green and Wright, was brought by parents of black schoolchildren against a government actor. Plaintiffs sought to enjoin in part the enforcement of Mississippi's long-established textbook lending program. The Mississippi Textbook Purchasing Board provided free textbooks to all schools in the state, including a number of "all-white, nonsectarian private schools which (had) been formed throughout the state since the inception of public school desegregation." Norwood v. Harrison, 340 F.Supp. 1003, 1011 (N.D.Miss.1972), vacated and remanded, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973). Despite the origin of the program in the days before school desegregation, and even if the textbook loans were "motivated by ... a sincere interest in the educational welfare of all Mississippi children," 413 U.S. at 466, 93 S.Ct. at 2811, the Supreme Court held the scheme unconstitutional to the extent that it did not "steer clear ... of giving significant aid to institutions that practice racial ... discrimination." Id. at 467, 93 S.Ct. at 2812.
 
 
 39
 Of prime relevance to the case at hand, the Court in Norwood plainly stated that it was not critical to the plaintiffs' claim for relief whether "any child enrolled in private school, if deprived of free textbooks, would withdraw from private school and subsequently enroll in the public schools." Id. at 465, 93 S.Ct. at 2811 (quoting from 340 F.Supp. at 1013). Chief Justice Burger, writing for the Court, explained:
 
 
 40
 We do not agree with the District Court in its analysis of the legal consequences of (the) uncertainty (whether the relief requested would result in student transfers from private to public schools), for the Constitution does not permit the State to aid discrimination even when there is no precise causal relationship between state financial aid to a private school and the continued well-being of that school. A State may not grant the type of tangible financial aid here involved if that aid has a significant tendency to facilitate, reinforce, and support private discrimination.
 
 
 41
 Id. at 465-66, 93 S.Ct. at 2810-11.
 
 
 42
 Plaintiffs in Norwood, like the plaintiffs here, indicated no interest in attending the private schools that received textbooks at state expense, nor did they show that the textbook subsidy kept those schools afloat. The gravamen of plaintiffs' complaint was that the state had aided private racial discrimination when the Constitution commanded that government "steer clear" of such action. That complaint was enough, the Court's disposition clarifies, to entitle plaintiffs to relief. Without departing radically from Norwood, therefore, we cannot accept the district court's apparent view that plaintiffs here must either pursue relief they do not want admission of their children to private schools or allege and prove that withdrawal of tax-exempt status would cause those schools to suffer enrollment declines and, correspondingly, quicken the pace of public school desegregation.
 
 
 43
 Finally, in Gilmore v. City of Montgomery, black citizens who had brought a successful action in 1958 to desegregate public parks in Montgomery, Alabama, reopened the litigation in 1970 and sought supplemental relief in 1971. They complained that the city was allowing "racially segregated schools and other segregated private groups and clubs to use city parks and recreational facilities." 417 U.S. at 562, 94 S.Ct. at 2421. The Court sustained a lower court injunction to the extent that it barred exclusive temporary use of public recreation facilities by segregated private schools. Citing Norwood, the Court repeated in Gilmore that
 
 
 44
 any tangible state assistance, outside the generalized services government might provide to private segregated schools in common with other schools, and with all citizens, is constitutionally prohibited if it has "a significant tendency to facilitate, reinforce, and support private discrimination."417 U.S. at 568-69, 94 S.Ct. at 2423-24 (quoting from 413 U.S. at 466, 93 S.Ct. at 2811). While Gilmore suggested that the plaintiffs might not have standing "to claim relief against certain nonexclusive uses by private school groups," id. at 570 n.10, 94 S.Ct. at 2425 n.10, the Court had little difficulty concluding that plaintiffs were entitled to challenge special reservation of playing fields for such groups.
 
 
 45
 Like the tax-exempt status at issue here, the exclusive temporary use of park facilities in Gilmore was a government benefit not available to the public generally. Government must "steer clear" of providing such benefits to racially discriminatory local groups. Norwood, 413 U.S. at 467, 93 S.Ct. at 2812. The Gilmore plaintiffs, black citizens of the community, were considered appropriate enforcers of that obligation although they made no showing that the segregated schools would change their policies or close up shop were they denied specially reserved access to park football fields and baseball diamonds. All that could be said with security was that the special arrangements made life easier for such schools.
 
 
 46
 Green, Norwood, and Gilmore presented plaintiffs whose standing seems to us indistinguishable on any principled ground from the standing of the plaintiffs in this action. If the plaintiffs before us are not entitled to question the IRS practices at issue here, it is difficult to comprehend why the Green, Norwood, and Gilmore plaintiffs were entitled to challenge the tax exemptions, textbook loans, and specially reserved park facilities at issue in those cases.[27] We therefore inquire next whether those precedents remain vital, or whether they have been overruled, sub silentio, by Eastern Kentucky.
 
 
 47
 The Supreme Court's decisions in Green, Norwood, and Gilmore did not focus on standing as Eastern Kentucky did. But as Eastern Kentucky emphasized, "(t)he necessity that the plaintiff who seeks to invoke judicial power stand to profit in some personal interest remains an Art. III requirement. A federal court cannot ignore this requirement without overstepping its assigned role in our system of adjudicating only actual cases and controversies." 426 U.S. at 39, 96 S.Ct. at 1925. Absent explicit Supreme Court direction to do so, we resist impugning High Court precedent by indulging the assumption that the Court reached the merits in Green, Norwood, and Gilmore in disregard of the standing requirement. Accord, Moton v. Lambert, 508 F.Supp. 367, 369-70 (N.D.Miss.1981). Such an assumption appears all the more unwarranted in view of the indications in all three cases that the Court's attention was drawn to the issue.
 
 
 48
 In Green, standing was addressed summarily in the lower court. 309 F.Supp. at 1132.[28] More significantly, the Jurisdictional Statement in Green spotlighted the question. Filed by intervenor Coit, as representative of a class of parents and children who supported or attended all-white private schools, the Jurisdictional Statement listed plaintiffs' standing first among "Questions Presented by the Appeal." Jurisdictional Statement at 11, Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971). As Coit framed the issue: "Was the lower court in error in holding that plaintiffs had constitutional standing to restrain federal recognition of educational exemptions for private segregated schools?" Id. While we do not ascribe to the Supreme Court's summary affirmance in Green wholesale endorsement of the district court's views,[29] the High Court's disposition is binding upon us until such time as the Court informs us otherwise. Hicks v. Miranda, 422 U.S. 332, 344-45, 95 S.Ct. 2281, 2289-90, 45 L.Ed.2d 223 (1975). As already observed, we do not believe a lower court should cast aside the Supreme Court's judgment in Green by ascribing to that tribunal a rush to decision, heedless of core justiciability requirements.
 
 
 49
 In Norwood, as in Green, plaintiffs' standing was challenged in the lower court. 340 F.Supp. at 1007. However, the issue was not pursued on appeal. But, of course, the question could have been raised by the Supreme Court sua sponte if it entertained doubt as to plaintiffs' satisfaction of a core Article III requirement. Finally, in Gilmore, the Court adverted specifically to the requirement that plaintiffs have standing to pursue the relief requested. 417 U.S. at 570 n.10, 94 S.Ct. at 2424 n.10.
 
 
 50
 In Eastern Kentucky, the Supreme Court viewed plaintiffs' sole injury as inflicted by the hospitals that declined to serve indigents, and not by the Internal Revenue Service. 426 U.S. at 40-41, 96 S.Ct. at 1925-26. In contrast, the Court did not approach Green, Norwood, and Gilmore as assaults mounted against government action in an indirect effort to gain access to a nongovernmental facility. Rather, the Court recognized the right of black citizens to insist that their government "steer clear" of aiding schools in their communities that practice race discrimination. In view of the centrality of that right in our contemporary (post-Civil War) constitutional order, we are unable to conclude that Eastern Kentucky speaks to the issue before us. We therefore follow Green, Norwood, and Gilmore, unless and until the Supreme Court instructs us otherwise, and accordingly find no standing impediment to plaintiffs' claim.
 
 
 51
 III. APPROPRIATIONS RIDERS STAYING IRS INITIATIVES DO NOT
 
 
 52
 PRECLUDE THE DISTRICT COURT FROM FASHIONING A REMEDY
 
 
 53
 In amendments to the Treasury Appropriations Act for fiscal year 1980,[30] Congress twice prohibited the Internal Revenue Service from using appropriated funds to formulate or carry out new guidelines which would cause any private school to lose tax-exempt status.[31] These riders, known as the Dornan and Ashbrook amendments, were intended both to preserve guidelines the IRS had adopted prior to August 1978 to identify racially discriminatory private schools,[32] and to prevent the Service from displacing or augmenting existing guidelines with more aggressive procedures.[33] In this case, the district court read into the congressional action more than a restraint on the IRS. It found that the action inhibited courts as well. Court-ordered rules of the kind plaintiffs seek, the district judge said, "would be completely contrary to Congressional intent and policy." 480 F.Supp. at 799. That consideration alone, he concluded, warranted threshold dismissal of the action.[34]
 
 
 54
 Intervenor Allen argues with force in support of the position adopted in this case by the district judge. The appropriations riders reflect a congressional determination that existing IRS procedures are adequate to identify racially discriminatory schools, intervenor Allen maintains,[35] therefore a court determination to the contrary would defy the will of Congress. Plaintiffs, on the other hand, maintain that the restraints imposed by the appropriations act riders, by their terms, apply only to IRS-initiated action and do not purport to control court adjudication. Read to extend to a federal court's remedial authority, plaintiffs assert, the riders could not withstand constitutional review.[36] The plaintiffs invoke both separation of powers doctrine[37] and the proscription of government support for race discrimination.[38]
 
 
 55
 Our starting point is a proposition not disputed in this litigation or in conflict with the appropriations riders: racially discriminatory institutions are ineligible for tax-exempt status under section 501(c)(3) of the Internal Revenue Code. As the court held in Green v. Connally,[39] schools that do not adopt and administer nondiscriminatory admissions practices do not qualify for tax benefits otherwise available to nonprofit educational organizations. Although the Green decision rests on statutory interpretation,[40] the court indicated that its ruling was impelled by constitutional considerations: "(A) contrary interpretation of the tax laws would raise serious constitutional questions"; "it would be difficult indeed to establish" that schools practicing racial discrimination could be ranked as tax-exempt organizations by a federal authority "consistently with the Constitution." 330 F.Supp. at 1164-65.[41]
 
 
 56
 Next, as we set out earlier,[42] in 1976 this action was commenced, and the Green case was reopened, based on the charge that the IRS had failed to enforce effectively the mandate that racially discriminatory schools be denied tax exemptions. In response, the IRS, in August 1978, released proposed new guidelines and, in February 1979, published a revised version that included adjustments to meet some, but by no means all, of the critical commentary. Explaining to Congress why the Service sought to strengthen its procedures, the Commissioner of Internal Revenue reported that, under the existing rules, a number of schools retained tax-exempt status although they had been adjudged racially discriminatory by federal courts in nontax cases.[43] In reaction to the proposed new IRS guidelines, Congress passed the appropriations limitations.[44] Thus the IRS proposals, framed under the impetus of pending litigation, were shelved by a "stopgap" legislative technique[45] that leaves the Service in an ambiguous position.[46]
 
 
 57
 Turbulent issues under our fundamental instrument of government would confront us were we to read the appropriations riders as more than a temporary stop order on IRS initiatives.[47] We see no reason to grapple with those issues in view of the representations made in Congress concerning the effect of the riders:
 
 
 58
 We are just saying do not go forward with these broad (IRS) regulations or procedures, whatever you want to call them, until the Congress or a court affirmatively acts on that subject. That is all we are trying to do.
 
 
 59
 125 Cong.Rec. H5882 (daily ed. July 13, 1979) (remarks of Rep. Ashbrook) (emphasis supplied).[48] As thus described, the riders are holding orders and they hold only the IRS, they do not purport to control judicial dispositions.
 
 
 60
 The district judge who, in this action, ruled out a judicial decree going beyond existing IRS guidelines, nevertheless granted such relief in the reopened Green case.[49] His rulings in the two proceedings have been perceived as "contradictory" and "inconsistent."[50] His sole explanation for the divergent dispositions appears in a footnote in this case supplying two reasons: (1) the "jurisdictional" arguments he found decisive in Wright had been rejected by another judge in Green before the two cases were consolidated; (2) the three-judge court had "affirmed" the standing of the Green plaintiffs prior to granting injunctive relief and the only issue open in that case was "whether or not defendants have complied with the injunction issued in 1971." 480 F.Supp. at 793 n.1.
 
 
 61
 The district judge did not explain why he regarded Green as uninstructive without precedential value on the "jurisdictional" arguments in Wright, nor did he clarify why he considered congressional action significant in Wright but not in Green. It is true that the Green litigation has a long history and involves Mississippi private schools only, while the instant case was initiated some seven years after Green commenced and encompasses private schools in all states. But the appropriations riders do not distinguish Mississippi from the rest of the nation. Nor did the original Green court interpret section 501(c) (3) for Mississippi only. Rather, that court declared the principle underlying its decision "applicable to schools outside Mississippi with the same or similar badge of doubt." 330 F.Supp. at 1174.[51] We believe the district judge correctly determined that no congressional action deterred him from moving beyond existing IRS guidelines in Green, and that he erred in rejecting at the outset any prospect for similar movement in this case.
 
 
 62
 IV. NO NONREVIEWABILITY DOCTRINE IMPEDES ADJUDICATION ON THE MERITS
 
 
 63
 Referring to "the doctrine of nonreviewability," the district judge deemed it inappropriate to adjudicate this action even if no standing problem barred the way and no congressional suggestion held him in check. 480 F.Supp. at 797-98. He relied on no statutory source for the doctrine invoked.[52] Citing two cases, however,[53] he reasoned that courts are not equipped to supply technical detail and monitoring services for an agency's administration of a complex statutory scheme. He concluded the discussion under this heading by observing that judicial review vel non was not the issue. Rather, the core question was the type of relief appropriate and feasible. In his judgment, appropriate relief could be gained through litigating case by case whether a particular school excludes or otherwise discriminates on the basis of race. We find no solid ground for dismissal of this action on the asserted "nonreviewability" premise.
 
 
 64
 First, as we pointed out in preceding portions of this opinion, in suggesting that appellants' remedy lies in case-by-case litigation against each allegedly offending school, the district court focused on an injury other than the one the complaint describes. To recapitulate, appellants disclaim any interest in gaining admission to the schools in question. Rather, they complain of conduct by their government. They assert that current IRS practice permits schools that in fact discriminate on the basis of race to acquire and retain section 501(c)(3) status and, thereby, to attract tax-deductible contributions for their maintenance. Part of each such contribution, appellants aver, constitutes prohibited government support for race discrimination in educational facilities.[54] Such government support, appellants contend, stigmatizes black schoolchildren and their parents by signaling official approbation of educational institutions that perpetuate in local communities notions, once prevalent in our nation, of the inferior quality of the black race. Thus their challenge, their alleged injury, and the relief they seek are directed to what a government agency, the IRS, is doing. They do not challenge private action, and it is not the prerogative of a district judge to turn away the lawsuit they have in fact instituted solely because they might have instituted a claim of a different character, one challenging private rather than government action.
 
 
 65
 Second, we turn to the case as appellants have drawn it, a case against a government agency alleged to furnish economic benefits to racially discriminatory local educational institutions. We believe that, should appellants succeed on the merits,[55] the remedial problem can be handled without large scale judicial intervention in the administrative process. This case does not involve any arcane question of tax law; its sensible adjudication requires no entanglement with complex, technical, interrelated aspects of the Internal Revenue Code and its administration.[56] The district court should not and need not become a "shadow (C)ommissioner of Internal Revenue" or "the administrator of a nationwide tax enforcement program." 480 F.Supp. at 797. Guided by its own experience[57] and that of other courts,[58] the district court is equipped to accord relief that does not "impose grave burdens" or involve "unfathomable effort." Id. The court may call for the parties' participation in framing a manageable decree and may reject proposals that, in their scope or particularity, reach for more than is necessary to provide effective relief.
 
 
 66
 In sum, neither deference to administrative expertise, nor potential action by the legislature supplies an acceptable basis for avoiding decision on the merits in this case. The area is not one in which tax experts have special competence,[59] nor is the Service in a comfortable position to reevaluate the adequacy of current procedures with a view to alteration.[60] Congress is not inhibited by the pendency of this case or Green from addressing the issue by revising section 501(c)(3) so that the provision speaks more precisely,[61] so long as such revision comports with constitutional limitations.
 
 CONCLUSION
 
 67
 We have held that the plaintiffs here have standing to pursue this action, that the district court retains independence to fashion a remedy should plaintiffs succeed on the merits, and that no nonreviewability doctrine impedes adjudication on the merits. Our rulings do not reach the substance of plaintiffs' claims. After affording all parties a full and fair opportunity to present their positions, the district court will be equipped to decide whether plaintiffs have established a claim for relief regarding the administration of section 501(c)(3).[62]
 
 
 68
 For the foregoing reasons, the judgment of the district court is reversed and the case is remanded for proceedings consistent with this opinion.
 
 
 69
 It is so ordered.
 
 TAMM, Circuit Judge, dissenting:
 
 70
 Under cover of selecting between conflicting lines of Supreme Court precedent, the court today boldly creates new law on the jurisdiction of federal courts. Under cover of selecting the most comfortable precedent, the court in fact oversteps well-established limits upon the power of the judiciary. We are not required, as the majority suggests, to choose among Supreme Court precedent as we would footwear selecting that which "best fits the case before us." Instead, we need only examine carefully the law of standing as it presently exists and properly apply that law to the case before us.
 
 
 71
 The majority's cleverly constructed and ostensibly reasonable opinion hinges initially upon the setting up of conflicting lines of Supreme Court precedent. In one, characterized by the majority as the "Eastern Kentucky " line, the Court addressed at some length the question of standing to sue in federal courts. In the other, characterized as the "Green, Norwood, and Gilmore " line, the Court addressed the constitutionality of governmental involvement in racial discrimination. Although a reading of the majority's analysis of this latter line of cases may lead one to think otherwise, the Supreme Court made no statement in these cases that can be construed as justifying the result reached by the court today. In fact, the only remarks by the Court upon the question of standing make clear that the traditional requirements of standing must be satisfied in this case as in any other. Gilmore v. City of Montgomery, 417 U.S. 556, 571 n.10, 94 S.Ct. 2416, 2425 n.10, 41 L.Ed.2d 304 (1974).
 
 
 72
 Despite this explicit reminder, the majority interprets this line of precedent as requiring it to abandon long-established standing principles, principles limiting the exercise of judicial power to the redress of actual injury. To assess the necessity of such an interpretation, we must first turn to those cases by which the majority claims to be bound. In Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971), the Supreme Court affirmed without opinion a decision that the Internal Revenue Code required the denial of tax exemptions for racially discriminatory private schools and of tax deductions for contributions to such schools. The Court also affirmed the awarding of injunctive relief barring the IRS from granting tax-exempt status to any private school in Mississippi which did not adopt a racially nondiscriminatory admissions policy and communicate that policy to the community. The Service adopted national guidelines in accord with this decision.
 
 
 73
 Plaintiffs' standing was not addressed in the district court decision affirmed by the Supreme Court. Green v. Connally, 330 F.Supp. 1150 (D.D.C.1971). Only in its ruling on the preliminary injunction did the district court deal with the issue at all, and even then its views were expressed in only one sentence. Green v. Kennedy, 309 F.Supp. 1127, 1132 (D.D.C.), appeal dismissed sub nom. Cannon v. Green, 398 U.S. 956, 90 S.Ct. 2169, 26 L.Ed.2d 539 (1970). Further elaboration of this issue was not undertaken at the Supreme Court: the standing of the plaintiffs was challenged only by the intervenor Coit, and only in the form of an initial question in the Jurisdictional Statement without any further development.
 
 
 74
 The majority opinion mischaracterizes the status of Green at this point as a "sharp adversary contest ...." Majority opinion (Maj. op.) at 823. In fact, the Supreme Court has explicitly stated that, because the IRS had reversed its position prior to appeal, this case did not involve "a truly adversary controversy." Bob Jones University v. Simon, 416 U.S. 725, 740 n.11, 94 S.Ct. 2038, 2047 n.11, 40 L.Ed.2d 496 (1974). For that reason, moreover, the Court declared that this case lacked "precedential weight ...." Id. See also Prince Edward School Foundation v. United States, --- U.S. ----, 101 S.Ct. 1408, 1408 n.1, 67 L.Ed.2d 376 (1981) (Rehnquist, J., joined by Stewart and Powell, JJ., dissenting from denial of certiorari). The majority opinion today thus declares itself bound on the issue of standing by a Supreme Court affirmance without opinion, in which the issue of standing was raised only in an intervenor's list of questions presented, and where the Court itself has explicitly undermined the precedential status of that affirmance. I find such a view of precedent disturbing[1] and believe that this court has never before advanced such a position.[2]
 
 
 75
 The majority opinion attempts to support the result it reaches by contrasting the action of the district court upon the reopening of Green with its action in the present context. Accordingly, the majority emphasizes at several places the similarity of these two cases, while pointing out their dissimilar dispositions. Maj. op. at 826, 827, 828, 835. Observing that the same district court judge ruled in both cases, the majority opinion suggests that such an "anomalous result" is irreconcilable and even arbitrary. A review of the procedural histories of these cases, however, reveals the fallacy of this suggestion. For this reason it is appropriate to set forth these histories before proceeding further.
 
 
 76
 Mississippi plaintiffs instituted Green in 1969. In 1970 a three-judge court issued a preliminary injunction against the IRS and noted, albeit summarily, that plaintiffs possessed standing. Green v. Kennedy, 309 F.Supp. 1127, 1132 (D.D.C.), appeal dismissed sub nom. Cannon v. Green, 398 U.S. 956, 90 S.Ct. 2169, 26 L.Ed.2d 539 (1970). The court did not address the question of standing upon issuance of the permanent injunction. Green v. Connally, 330 F.Supp. 1150 (D.D.C.), aff'd mem. sub nom. Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971).
 
 
 77
 The Green plaintiffs reopened this case in 1976, one week prior to the filing of the action here on appeal. Wright and Green were then consolidated and, on May 17, 1977, the late Judge Waddy heard motions to dismiss that raised the precise jurisdictional issues before us today. During this hearing Judge Waddy emphasized at several points his belief that "separate considerations" governed the two cases. See, e. g., Hearing Transcript of May 17, 1977, at 18. At one such point, he aptly characterized the standing argument pressed by the Wright plaintiffs' counsel as being that "you're Black and a citizen, and live in South Carolina," and thereby possess standing. Id. at 91. At the conclusion of the hearing, Judge Waddy denied the Government's motion to dismiss in Green but took the motion in Wright under advisement. The court found that the Green plaintiffs "have a right to proceed to determine whether or not that there has been good-faith compliance with the Order of this Court and if not, then the Court has the duty and responsibility to amend or supplement its prior Decree in such manner as to affect (sic) the purposes of the original Decree." Id. at 106-07.
 
 
 78
 Thus, before Green had reached the chambers of the present district court judge, not only had two other district courts sustained plaintiffs' standing, but the Supreme Court had affirmed, however summarily, the granting of the permanent injunction. In these circumstances, therefore, it would appear reasonable for the district court to accept the prior rulings on standing as the law of the case. See United States ex rel. Epton v. Nenna, 446 F.2d 363, 365-66 (2d Cir.), cert. denied, 404 U.S. 948, 92 S.Ct. 282, 30 L.Ed.2d 265 (1971). Although "law of the case" principles do not apply as stringently to jurisdictional questions such as standing,[3] it is not necessary for us to decide whether this failure to reconsider standing was erroneous. At the least, these disparate histories provide a logical explanation for the district court's seemingly disparate treatment of these related matters. The majority opinion chastizes the district court for failing to "explain why (it) regarded Green as uninstructive without precedential value on the 'jurisdictional' arguments in Wright ...." Maj. op. at 835. I, on the other hand, commend the district court both for its refusal to adopt the view of precedent espoused today by the majority and for its attempt to apply the current law of standing to what is, after all, a question of standing.
 
 
 79
 Unlike Green, the two other cases "binding" the majority are dispositions by opinion. Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973); Gilmore v. City of Montgomery, 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974). In Norwood, however, as in Green, the Court made no mention of the plaintiffs' standing. The district court, ruling the textbook program constitutional, had sustained plaintiffs' standing in one sentence, 340 F.Supp. at 1007,[4] and, as the majority opinion points out, this "issue was not pursued on appeal." Maj. op. at 835. In Gilmore, on the other hand, reference was made to the question of standing. 417 U.S. at 570-71 n.10, 94 S.Ct. at 2424-25 n.10. Moreover, this reference deserves more attention than that received from the majority's passing allusion for this reference demonstrates the fallacy of the majority's reliance upon either Gilmore or Norwood to sustain the standing of the plaintiffs presently before the court.
 
 
 80
 As the majority opinion notes, maj. op. at 830, black citizens who had won the desegregation of public parks in Montgomery, Alabama in 1958 reopened that litigation in 1970. 417 U.S. at 560, 94 S.Ct. at 2419-20. Filing a motion for supplemental relief in 1971, they alleged that the city was permitting racially segregated schools, groups, and clubs to use public recreational facilities. The district court enjoined the city from permitting use of its recreational facilities by any private school that was racially segregated or that had a racially discriminatory admissions policy. The court of appeals sustained that part of the injunction which restrained the use of facilities when that use was "exclusive" and not in common with other citizens, but reversed that part of the district court order enjoining nonexclusive enjoyment of those facilities by private school children.
 
 
 81
 Defining "exclusive use" as the possession and control of an entire facility by a private group, the Supreme Court sustained the injunction to the extent of prohibiting such use by racially segregated private schools. The Court found that "the city's policy of allocating facilities to segregated private schools, in the context of the 1959 parks desegregation order and subsequent history, created, in effect, 'enclaves of segregation' and deprived petitioners of equal access to parks and recreational facilities." Id. at 566, 94 S.Ct. at 2423. As to the modification made by the court of appeals, however, permitting nonexclusive access to public recreational facilities even by private organizations having racially discriminatory admissions policies, the Court reversed, stating:
 
 
 82
 Upon this record, we are unable to draw a conclusion as to whether the use of zoos, museums, parks, and other recreational facilities by private school groups in common with others, and by private nonschool organizations, involves government so directly in the actions of those users as to warrant court intervention on constitutional grounds.... The questions to be resolved and the decisions to be made rest upon careful identification of the different types of city facilities that are available and the various uses to which they might be put by private groups.
 
 
 83
 Id. at 570, 94 S.Ct. at 2424. It thus remanded the case to the district court.
 
 
 84
 At this time the Court also remarked upon the standing of plaintiffs on remand.
 
 
 85
 (W)e are not prepared, at this juncture and on this record, to assume the standing of these plaintiffs to claim relief against certain nonexclusive uses by private school groups. The plaintiffs in Norwood were parties to a school desegregation order and the relief they sought was directly related to the concrete injury they suffered. Here, the plaintiffs were parties to an action desegregating the city parks and recreational facilities. Without a properly developed record, it is not clear that every nonexclusive use of city facilities by school groups, unlike their exclusive use, would result in cognizable injury to these plaintiffs. The District Court does not have carte blanche authority to administer city facilities simply because there is past or present discrimination. The usual prudential tenets limiting the exercise of judicial power must be observed in this case as in any other.
 
 
 86
 Id. at 570-71 n.10, 94 S.Ct. at 2424-25 n.10 (emphasis added). The Supreme Court thus refused to assume that black citizens of Montgomery would suffer "cognizable injury" from, and thereupon have the requisite standing to challenge, any use of public recreational facilities by private school groups, even those groups with racially discriminatory admissions policies. Instead, because nonexclusive use, by definition, meant that facilities were available to other persons, the Court indicated that an examination of challenges to such uses should focus upon their actual impact upon plaintiffs. Those plaintiffs who could successfully establish some such injury would demonstrate the personal stake in the controversy necessary to the invocation of judicial relief.
 
 
 87
 In this brief glance at standing, the Court made clear that in cases concerning alleged racial discrimination, as elsewhere, both the constitutional and prudential limitations upon the exercise of judicial power must be observed. That such limits were observed in Gilmore and Norwood seems evident. In Norwood, the plaintiffs, parties to a school desegregation order, challenged the constitutionality of a Mississippi state law that authorized the provision of free textbooks to all schoolchildren regardless of the admissions policies of the schools they attended. The relief they sought and obtained would thus end state aid to discriminatory schools and was therefore "directly related to the concrete injury they suffered." Id. In Gilmore, the plaintiffs, parties to an action desegregating public parks, challenged the exclusive use of facilities that "created, in effect, 'enclaves of segregation' " and thus deprived them of equal access to recreational facilities. Id. at 566, 94 S.Ct. at 2423. The relief they sought and obtained would thus end state action that "operated directly to contravene an outstanding school desegregation order." Id. at 568, 94 S.Ct. at 2423.[5]
 
 
 88
 Similar observance of these limitations requires that this court determine initially whether the plaintiffs here have "suffered 'some threatened or actual injury resulting from the putatively illegal action ....' " Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (quoting Linda R.S. v. Richard D., 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973)).[6] In this case plaintiffs allege two injuries. First, they allege that the exemptions granted by the IRS "constitute tangible financial aid and other assistance to racially segregated education." Complaint at 3, Appendix at 11. Second, they allege injury that is, at first glance, similar to that alleged in Gilmore : interference "with the efforts of federal courts, HEW and local school authorities to desegregate racially dual school systems." Id. The allegations of actual injury made here must be uncovered with some care.
 
 
 89
 The majority opinion apparently holds that the "very act by the IRS of according tax exemption to a school that discriminates ... causes immediate injury to (plaintiffs) and that is the only injury for which they seek redress." Maj. op. at 827. In other words, because plaintiffs allege the violation of their constitutional rights, they have alleged injury. This approach apparently adopted by the court today postulates unlimited judicial power. The Supreme Court has rejected similar attempts to circumvent the limitations imposed by Article III. In O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), to take only one example, plaintiffs alleged that specific city and county officials had engaged in various patterns and practices of conduct, systematically depriving plaintiffs of their constitutional rights. Under the approach adopted by the court today, it would seem that these plaintiffs, by alleging violation of their rights, had alleged injury sufficient to confer jurisdiction upon a federal court. The Supreme Court, however, reached a different conclusion. After examining closely the allegations of injury placed before it, the Court determined that while plaintiffs had alleged the violation of constitutional rights, "(n)one of the named plaintiffs (was) identified as himself having suffered any injury in the manner specified." Id. at 495, 94 S.Ct. at 676. On that basis the Court denied plaintiffs standing. This decision in and of itself thus forbids the approach advanced by the majority today. See also Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1971) (alleged violation of First Amendment rights no substitute for specific injuries).
 
 
 90
 The second injury that plaintiffs claim interference with their court-ordered right to a desegregated public education does not represent actual injury because plaintiffs fail to allege the necessary components of such a claim. "Interference" only takes place upon the actual violation of plaintiffs' constitutional rights: in this context, through the use by private schools of racially discriminatory admissions policies.[7] The complaint does not allege discrimination by these named schools against these plaintiffs. Although it is somewhat difficult to ascertain from its anfractuous opinion, the majority apparently reads into this complaint the allegation that the target schools therein mentioned discriminate on racial grounds. See, e. g., maj. op. at 829 n.24 ("the heart of plaintiffs' complaint is that government ( ) grac(es) racially discriminatory educational facilities with tax-exempt status ....") (emphasis added). I think it unnecessarily generous so to replead the plaintiffs' complaint. For lack of a specified claim of discrimination, therefore, the complaint must fail as an attempt to invoke judicial relief against actions by a third party, here the Internal Revenue Service, for allegedly contributing to "interference" with a court-ordered right to desegregated education.[8]
 
 
 91
 What the plaintiffs actually challenge here is the adequacy of agency enforcement procedures, arguing that the IRS has failed to weave its net of enforcement fine enough to catch all of the private schools that may discriminate on the basis of race. The majority concludes that such a contention is sufficient to confer jurisdiction upon a federal court. This approach to the question of standing mandates continuing judicial supervision of all public agencies whose enforcement of the law touches upon the constitutional rights of citizens. Cf. Reporters Committee for Freedom of the Press v. American Telephone & Telegraph Co., 593 F.2d 1030, 1069-70 (D.C.Cir.1978), cert. denied, 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979). Such an approach cannot be justified.
 
 
 92
 Under Supreme Court precedent, this contention cannot support a federal court's exercise of jurisdiction. As this court recently noted, such precedent makes clear that an
 
 
 93
 asserted interest in the proper administration of the laws is a generalized one shared by all other citizens. Such an abstract injury is insufficient for standing. Schlesinger v. Reservists Committee to Stop the War, 418 U.S. (208) at 217, 219-21 (94 S.Ct. 2925, 2930, 2931-32, 41 L.Ed.2d 706) .... In Reservists, the Supreme Court held that standing to sue may not be predicated upon an interest that is held in common by all members of the public, such as is present in this case .... Although the proper administration of the laws serves the interests of all, "(t)he proposition that all (laws) are enforceable by any citizen simply because citizens are the ultimate beneficiaries ... has no boundaries." Id. at 226-27 (94 S.Ct. at 2934-35).
 
 
 94
 Daughtrey v. Carter, 584 F.2d 1050, 1058 (D.C.Cir.1978). See also Goldwater v. Carter, 617 F.2d 697, 709-10 (D.C.Cir.1979) (en banc) (Wright, C. J., concurring in the result) ("All Americans have a stake in seeing that their leaders act according to the constitutional scheme. The question here is whether these (plaintiffs) have a specific personal stake in the outcome of the case.") (emphasis added), vacated, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979). As counsel for appellants conceded at oral argument, all citizens have an interest in the elimination of discrimination. The majority cannot, therefore, justify its grant of standing upon the assertion of an interest, however strongly felt, in the effective administration of the tax laws.
 
 
 95
 Appellants contend that they have more than a general interest in the effectiveness of IRS procedures. They claim to suffer "distinct and palpable injury when discriminatory private schools receive or retain tax exemptions." Brief for Appellants at 30. The majority opinion attempts to particularize this asserted interest by characterizing plaintiffs' injury as "the denigration they suffer as black parents and schoolchildren when their government graces with tax-exempt status educational institutions in their communities that treat members of their race as persons of lesser worth." Maj. op. at 827. A similar reliance on ethnic affinity, however, was recently held by this court to be insufficient to constitute the personal stake requisite to standing.
 
 
 96
 In American Jewish Congress v. Vance, 575 F.2d 939 (D.C.Cir.1978), Jewish citizens challenged the federal government's participation in, and implementation of, certain cooperative programs between the United States and Saudi Arabia. Plaintiffs contended that the implementation of "any program or activity involving the Government of Saudi Arabia which directly or indirectly discriminates against American citizens by reason of their Jewish religion, ancestry, or identity" was unconstitutional. Complaint at 9. The plaintiffs before the court were the American Jewish Congress, a nonprofit association of American Jews, and six individual members of the Congress. Four of the six individuals claimed the right to challenge the government action solely as citizens, taxpayers, and persons "of the Jewish religion, ancestry, and identity." 575 F.2d at 945. One plaintiff alleged that he was deterred from applying for a job with a corporation operating in Saudi Arabia because of Saudi Arabian discrimination; the other individual plaintiff claimed that he was denied a job with another organization solely because of his Jewish religion. This court held that none of these plaintiffs had standing to challenge the United States involvement in this alleged discrimination.[9]
 
 
 97
 Those plaintiffs who claimed standing on the basis of their status as American Jewish citizens argued that the implementation of cooperative programs between this country and Saudi Arabia "had the purpose and effect of deterring and discouraging American Jews from applying for or otherwise seeking employment and other economic opportunities resulting from the Agreement on Saudi-Arabian-United States Cooperation, although but for their religion, ancestry or identity they are qualified therefor." Complaint at 8. Despite this allegation of substantial governmental involvement in illegal discrimination, this court did not automatically extend to those plaintiffs the right to challenge that involvement. Instead the court proceeded to assess the injury purportedly arising from that governmental involvement. A direct comparison of the plaintiffs in the case at hand with these particular plaintiffs reveals the even more attenuated nature of the allegations presented herein. These plaintiffs are black parents and their schoolchildren who challenge governmental involvement in the form of tax exemptions to racially segregated private schools. Nowhere do the plaintiffs allege that they sought admission to these schools, that they were deterred from applying, or even that the schools engage in unlawful discrimination. In essence, they allege only that the inadequacy of Service procedures encourages the development of racially segregated schools, thereby undermining their right to public school desegregation. It would appear, therefore, that the plaintiffs here are in no better position than the Jewish citizens above who challenge United States involvement with Saudi Arabian discrimination solely as American citizens of the Jewish religion. "Once again, however, the plaintiffs have fallen short of alleging the type of concrete and direct injury requisite to invocation of federal judicial power." See ex Parte Levitt, 302 U.S. (633) at 634, 58 S.Ct. 1 (at 1, 82 L.Ed. 493). 575 F.2d at 945.
 
 
 98
 The court today thus either distinguishes American Jewish Congress because the plaintiffs before us are black, see, e. g., maj. op. at 832 (noting the "centrality" in our post-Civil War constitutional order of the right of black citizens to be free from discrimination), or implicitly overrules that decision. I find it difficult to credit the majority's apparent distinction of that case, maj. op. at 829 n.24, which suggests that future plaintiffs may secure standing in federal court simply by alleging that "the government action in question contributed to perpetuation within our borders of a view of (them) as persons of lesser worth," id., especially when the American Jewish Congress plaintiffs complained specifically about "the degree to which American citizens of the Jewish faith are discriminated against ...." Brief for Appellants at 6, American Jewish Congress v. Vance, 575 F.2d 939 (D.C.Cir.1978). Moreover, this distinction simply begs the question since every form of illegal discrimination presumably contributes to a view of that class of citizens as persons of lesser worth.
 
 
 99
 The consistent emphasis throughout the majority opinion upon the significance of the "right" asserted in this case suggests another impermissible factor underlying the court's decision. Relying primarily upon certain language from Norwood, the court defines the right asserted here as "the right of black citizens to insist that their government 'steer clear' of aiding" institutions that discriminate. Maj. op. at 832. Because of the significance of this right, it seems, the majority does not apply the principles of standing applicable to other plaintiffs attempting to assert other rights. Consequently, underlying the whole of the majority opinion is a rejection of the Supreme Court's statement in Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968), that "(t)he fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." (emphasis added). In other words,
 
 
 100
 no matter how inclined we may be toward appellant's position on the merits, we must first satisfy ourselves that he "has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."
 
 
 101
 Reuss v. Balles, 584 F.2d 461, 465 (D.C.Cir.1978) (quoting Warth v. Seldin, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 2204-05, 45 L.Ed.2d 343 (1975) (quoting Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962))), cert. denied, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978). See also Doherty v. Rutgers School of Law Newark, 487 F.Supp. 1291, 1298 (D.N.J.1980).[10] The majority thus errs by finding standing through "premature evaluation of the merits of (plaintiffs') complaint." Schlesinger v. Reservists Committee, 418 U.S. at 225, 94 S.Ct. at 2934.
 
 
 102
 Plaintiffs have argued to this court that as black parents and schoolchildren they are entitled to challenge IRS enforcement procedures, the inadequacy of which they claim interferes with their right to a desegregated education. I believe, however, that these plaintiffs have failed to plead injury in fact.[11] They have failed to "demonstrate a likelihood of benefit wholly apart from a defendant's response to the district court's decree." City of Hartford v. Town of Glastonbury, 561 F.2d 1032, 1053 (2d Cir. 1977) (en banc) (Kaufman, J., concurring), cert. denied, 434 U.S. 1034, 98 S.Ct. 766, 54 L.Ed.2d 781 (1978).[12] Nowhere do they allege the predicate of discrimination necessary to invoke judicial power. Nevertheless, this court confers standing upon these plaintiffs in a decision that masquerades as a mere application of precedent.
 
 
 103
 The court's decision today reflects an approach to the question of standing that is simply and clearly wrong, the product of an impermissible shift in focus from the right of these plaintiffs to make their challenge to the rights they wish to assert. In its haste to afford plaintiffs an opportunity to vindicate their chosen cause, the majority not only expands significantly the law of standing but also oversteps the constitutional limits of its jurisprudential power.[13] As other courts have recognized, issues of great import fail to justify such overreaching.[14] This court would do well, therefore, to attend the following admonition of the Second Circuit:
 
 
 104
 The Supreme Court has warned repeatedly in the past of the hazards in straying from the Constitutional requirement of a case or controversy. Absent adherence to the Constitutional mandate, courts become forums for the vindication of personal values and political preferences, usurping the legislative branch as the focus for public debate and lobby, and usurping as well the executive's primary responsibility for the implementation of federal law. Federal courts cannot, consistent with the Constitution, exercise their jurisdiction to vindicate litigants' chosen causes; they are empowered only to grant specific relief in response to, and in order to remedy, a particularized showing of individual injury.
 
 
 105
 Evans v. Lynn, 537 F.2d 571, 595-96 (1976) (en banc) (footnotes omitted), cert. denied, 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977).
 
 
 
 [1]
 Under section 501(c)(3) of the Internal Revenue Code, implemented by § 501(a), corporations "organized and operated exclusively for religious, charitable, scientific, ... or educational purposes" are exempt from federal income taxation. Such organizations are also exempt from federal social security taxes (FICA), I.R.C. § 3121(b)(8)(B), and from federal unemployment taxes (FUTA), I.R.C. § 3306(c)(8). Since a private school's "income" often does not exceed deductible expenses, the primary benefit of tax-exempt status derives from § 170, which permits donors to deduct contributions to exempt organizations from gross income. Such contributions are also deductible for federal estate and gift tax purposes under §§ 2055 and 2522. For discussion of the importance of tax-deductible contributions to private schools, see Tax-Exempt Status of Private Schools: Hearings Before the Subcomm. on Oversight of the House Comm. on Ways and Means, 96th Cong., 1st Sess. 302 (1979) (hereinafter cited as Hearings ) (testimony of William B. Ball); id. at 388-89 (testimony of W. Wayne Allen, Chairman of the Board, Briarcrest School System); id. at 400 (statement of John Esty, Jr., Pres., Nat'l Ass'n of Independent Schools)
 
 
 [2]
 We decline to address in the first instance other issues raised before, but not yet considered by, the district court
 
 
 [3]
 The plaintiffs asserted that the Internal Revenue Code was unconstitutional to the extent that it authorized the Service to grant tax-exempt status to segregated schools. Green v. Kennedy, 309 F.Supp. at 1131. At that time 28 U.S.C. § 2282 provided that only a three-judge court composed under then § 2284 could issue an injunction "restraining the enforcement, operation or execution of any Act of Congress for repugnance to the Constitution." Section 2282 has since been repealed. Act of August 12, 1976, Pub.L. No. 94-381, § 2, 90 Stat. 1119
 
 
 [4]
 IRS News Release (July 10, 1970), reprinted in Hearings, supra note 1, at 10
 
 
 [5]
 Plaintiffs' standing, questioned prior to issuance of the preliminary injunction, was not further addressed at this stage of the litigation. The court treated comprehensively, however, objections pressed by intervenors based on First Amendment freedom of association concerns that related to the right to educate one's child in a school of the parent's choice, whether public, private, or parochial. 330 F.Supp. at 1165-69. Cf. Bittker & Kaufman, Taxes and Civil Rights: "Constitutionalizing" the Internal Revenue Code, 82 Yale L.J. 51, 76 (1972) (distinguishing between segregated schools and other segregated private associations on the ground that racially restricted education, public or private, contravenes overriding public policy). With respect to the relative strength of countervailing freedom of association interests, compare Runyon v. McCrary, 427 U.S. 160, 175-76, 96 S.Ct. 2586, 2596-97, 49 L.Ed.2d 415 (1976) (private schools), with Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 179-80, 92 S.Ct. 1965, 1974-75, 32 L.Ed.2d 627 (1972) (Douglas, J., dissenting) (private clubs)
 
 
 [6]
 Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971). The appeal was pursued by the intervenors. See note 29 infra
 
 
 [7]
 See particularly Rev.Proc. 72-54, 1972-2 C.B. 834; Rev.Proc. 75-50, 1975-2 C.B. 587
 One section of the current IRS guidelines, Rev.Proc. 75-50, § 8, makes special reference to Mississippi:
 Mississippi Schools
 The United States District Court for the District of Columbia has ordered specific guidelines and record-keeping requirements for Mississippi private schools. Green v. Connally, 330 F.Supp. 1150, aff'd sub nom. Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971). To the extent that the requirements of the Court's Order vary from the guidelines and recordkeeping requirements set forth in this Revenue Procedure, the Court's Order is controlling for Mississippi schools.
 1975-2 C.B. at 590.
 
 
 [8]
 See Hearings, supra note 1, at 236-51 (letter and attachments from Arthur S. Flemming to Jerome Kurtz). The Civil Rights Division of the Department of Justice had suggested stronger language for the proposed IRS guidelines and later criticized the final guidelines as ineffective. Id. at 1181-82, 1187-91 (statement of James P. Turner)
 
 
 [9]
 Hearings, supra note 1, at 5 (statement of Jerome Kurtz)
 
 
 [10]
 Motion to Enforce Decree and for Further Declaratory and Injunctive Relief at 7 (July 23, 1976), Green v. Miller
 
 
 [11]
 Hearings, supra note 1, at 6 (statement of Jerome Kurtz)
 
 
 [12]
 43 Fed.Reg. 37296 (Aug. 22, 1978), reprinted in Hearings, supra note 1, at 21
 
 
 [13]
 44 Fed.Reg. 9451 (Feb. 13, 1979), reprinted in Hearings, supra note 1, at 41
 
 
 [14]
 Hearings, supra note 1, at 6-7 (statement of Jerome Kurtz)
 
 
 [15]
 Id. at 6
 
 
 [16]
 Treasury, Postal Service, and General Government Appropriations Act, 1980, Pub.L.No.96-74, 93 Stat. 559 (1979)
 
 
 [17]
 Id. § 615
 
 
 [18]
 Id. § 103
 
 
 [19]
 The restrictions lapsed October 1, 1980, when a new fiscal year opened. They were continued in force, however, until June 5, 1981, under H.R.J. Res. 644, Pub.L.No.96-536, 94 Stat. 3166 (1980)
 
 
 [20]
 See Green v. Miller, No. 1355-69 (D.D.C. May 25, 1971) (order denying motion to dismiss). The district court apparently considered the objection foreclosed by prior proceedings in Green. See Hearing Transcript of May 17, 1977, at 35, 106-07. See also text following note 50 infra
 
 
 [21]
 Green v. Connally, 330 F.Supp. at 1174; cf. 126 Cong.Rec. H5193 (daily ed. June 18, 1980) (remarks of Rep. Ashbrook referring to the Green and Wright dispositions as "contradictory opinions")
 
 
 [22]
 Davis, Standing, 1976, 72 Nw.U.L.Rev. 69, 69 (1977)
 
 
 [23]
 Id. at 70; cf. Americans United for Separation of Church & State, Inc. v. United States Dep't of Health, Education and Welfare, 619 F.2d 252 (3d Cir. 1980), cert. granted sub nom. Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., --- U.S. ----, 101 S.Ct. 1345, 67 L.Ed.2d 332 (1981)
 
 
 [24]
 After Eastern Kentucky, this court held, in American Society of Travel Agents v. Blumenthal, 566 F.2d 145 (D.C.Cir.1977), cert. denied, 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978), that an association of travel agents lacked standing to challenge the failure of the Service to tax income the American Jewish Congress (AJC) derived from its travel programs. It was speculative, the court said, whether taxing the travel-related income of the AJC would yield increased patronage and profits to commercial travel agencies. The court also ruled in Tax Analysts & Advocates v. Blumenthal, 566 F.2d 130 (D.C.Cir.1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), that a small, domestic oil well operator lacked standing (under the "zone of interests" test) to seek a declaratory judgment that tax credits the Service granted to American oil producers for taxes paid to foreign nations were not authorized by the Internal Revenue Code
 Eastern Kentucky was featured in Judge Tamm's opinion in American Jewish Congress v. Vance, 575 F.2d 939 (D.C.Cir.1978), in which this court divided three ways in approaching an effort by American Jews to stop United States cooperation in certain programs designed to foster Saudi Arabia's economic development. Plaintiffs there asserted economic injury but, as Judge Tamm pointed out, the relief requested, termination of the cooperative programs, "would eliminate the very economic advantages in which plaintiffs ... alleged an interest." We find scant resemblance between that case, freighted with implications for United States relations with foreign nations that do not embrace our constitutional ideals, and the one before us, which involves the government's obligation to steer clear of aiding educational institutions that discriminate on an impermissible basis. Id. at 946. Thus, Green, Norwood, and Gilmore were not in point in American Jewish Congress. Plaintiffs did not press, and the court did not consider any contention that the government action in question contributed to perpetuation within our borders of a view of Jews as persons of lesser worth. Here, by contrast, the heart of plaintiffs' complaint is that government, by gracing racially discriminatory educational facilities with tax-exempt status, denigrates the standing and dignity of black Americans in their home communities.
 
 
 [25]
 But cf. note 1 supra (significance of tax-exempt status to private schools)
 
 
 [26]
 The court on remand in Norwood v. Harrison, 382 F.Supp. 921, 924 n.2 (N.D.Miss.1974), noted that several schools whose practices the plaintiffs challenged elected to return books given them by the Mississippi State Textbook Commission rather than subject their policies to further scrutiny
 
 
 [27]
 At oral argument, the Service stressed that Green (when the action commenced in 1969), Norwood, and Gilmore, were egregious cases. In those cases, the private schools aided by government action openly avowed discriminatory policies while in this case, plaintiffs do not allege that any particular school turns away students on the basis of race. Instead, plaintiffs complain more generally that some schools "are slipping through the Commissioner's net of enforcement." But the standing analysis should remain unaffected so long as plaintiffs have a right to demand that their government "steer clear" of aiding discrimination in local educational facilities, and contend, as plaintiffs do here, that current government (IRS) practice does not meet the "steer clear" standard. Cf. note 43 and accompanying text, infra (Commissioner's acknowledgment that, under current guidelines, schools adjudged racially discriminatory nonetheless retained tax-exempt status)
 We do not include Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), in the same category as Green, Norwood, and Gilmore, although plaintiffs cite Griffin with the others. That most egregious case involved more than state aid to a private actor. In addition to government assistance for private school education in the form of tuition grants and tax credits, the county's public schools had been closed down.
 
 
 [28]
 The relevant passage is set out at 823 supra
 
 
 [29]
 Because the IRS changed its course before the issuance of the permanent injunction in Green, the Supreme Court later noted that the summary affirmance in Coit v. Green "lacks the precedential weight of a case involving a truly adversary controversy." Bob Jones University v. Simon, 416 U.S. 725, 740 n.11, 94 S.Ct. 2038, 2047 n.11, 40 L.Ed.2d 496 (1974). The admonition was stated more vigorously in Prince Edward School Foundation v. United States, --- U.S. ----, 101 S.Ct. 1408, 1408 n.1, 67 L.Ed.2d 376 (1981) (Rehnquist, J., dissenting from denial of certiorari) ("th(e) affirmance lacks precedential weight because no adversarial contest remained in Green by the time the case reached this court"). It should be noted, however, that the plaintiffs sought and obtained relief in Green beyond the measures the Service agreed to take. See 330 F.Supp. at 1170, 1174-77. More significantly, the intervenors who appealed to the Supreme Court in Green remained uncompromisingly adverse to the plaintiffs
 We note finally that, although Green was not such a case, there are extraordinary situations in which the Supreme Court may proceed to judgment despite the absence of a genuine adversary contest in the lower courts. See Granville-Smith v. Granville-Smith, 349 U.S. 1, 4, 75 S.Ct. 553, 555, 99 L.Ed. 773 (1955) ("In view of the lack of genuine adversary proceedings at any stage in this litigation, the outcome of which could have far-reaching consequences on domestic relations throughout the United States, the Court invited specially qualified counsel 'to appear and present oral argument, as amicus curiae, in support of the judgment below.' ") (quoting from Granville-Smith v. Granville-Smith, 348 U.S. 885, 885-86, 75 S.Ct. 205, 99 L.Ed. 696 (1954)).
 
 
 [30]
 Treasury, Postal Service, and General Government Appropriations Act, 1980, Pub.L.No.96-74, 93 Stat. 559 (1979)
 
 
 [31]
 See notes 17-19 and accompanying text supra
 
 
 [32]
 See notes 4 & 7 and accompanying text supra
 
 
 [33]
 See notes 11-15 and accompanying text supra
 
 
 [34]
 The district judge recognized, however, that Congress had not dictated his course. He agreed with plaintiffs that "the legislative history of the (appropriations riders) apparently allows a federal court to fashion a remedy in this area." 480 F.Supp. at 799 (emphasis in original). Accord, 126 Cong.Rec. H7212-13 (daily ed. Aug. 19, 1980) (remarks of Rep. Gradison)
 
 
 [35]
 Typical of the view expressed by proponents of the riders is the statement of Senator Helms, quoted by intervenor:
 The existing law provides substantial procedures for the IRS to deny the tax exempt status of schools which discriminate.
 ... (The appropriations bill amendment) does not change the existing law contained in Revenue Procedure 75-50, and thus it preserves the ability of IRS to act against offending schools on a case-by-case basis.
 
 
 [125]
 Cong.Rec. S11979-80 (daily ed. Sept. 6, 1979)
 
 
 [36]
 Plaintiffs further urge that, even as restraints directed solely to the IRS, the appropriations act riders are unconstitutional. Cf. Parnell, Congressional Interference in Agency Enforcement: The IRS Experience, 89 Yale L.J. 1360, 1368-86 (1980) (suggesting that the riders may violate establishment ban or equal protection guarantee but not separation of powers doctrine). The question before us concerns only the propriety of court adjudication. We do not reach the further issue plaintiffs tender regarding the legitimacy of appropriations riders to stop IRS action
 
 
 [37]
 Cf. Nixon v. Administrator of General Services, 433 U.S. 425, 441-43, 97 S.Ct. 2777, 2789-90, 53 L.Ed.2d 867 (1977). See also Hearings, supra note 1, at 366 (statement of Professor Laurence Tribe)
 
 
 [38]
 See Brown v. Califano, 627 F.2d 1221, 1235-37 (D.C.Cir.1980). See generally Note, The Judicial Role in Attacking Racial Discrimination in Tax-Exempt Private Schools, 93 Harv.L.Rev. 378 (1979)
 
 
 [39]
 See notes 4-6 and accompanying text supra
 
 
 [40]
 The three-judge court looked to the common-law definition of "charitable" but ultimately rested on the overriding federal policy against racial discrimination, a policy directed most pointedly against government support for racially segregated education. 330 F.Supp. at 1163-64
 Congress appears to agree with the Green court that section 501(c)(3) does not accommodate tax-exempt status for racially discriminatory private schools. No effort has been made to require the IRS to withdraw guidelines adopted before August 1978. Moreover, Congress overturned a court holding, McGlotten v. Connally, 338 F.Supp. 448, 457-59 (D.D.C.1972) (three-judge court), that nonprofit social clubs, although racially discriminatory, were eligible for tax-exempt status under section 501(c)(7). Congress added section 501(i), which explicitly denies exempt status to social clubs that discriminate "against any person on the basis of race, color, or religion." Act of Oct. 20, 1976, Pub.L.No.94-568, § 2(a), 90 Stat. 2697 (erroneously enacted as subsection (g); corrected 1978). The Senate Report on the private club provision cites Green as the leading case on tax-exempt status under section 501(c)(3) for educational institutions, and reflects an understanding that race discrimination disqualifies private schools from obtaining or retaining tax exemption. S.Rep.No.1318, 94th Cong., 2d Sess. 8 n.5 (1976), U.S.Code Cong. & Admin.News 1976, p. 6051. But cf. Prince Edward School Foundation v. United States, --- U.S. ----, ----, 101 S.Ct. 1408, 1410, 67 L.Ed.2d 376 (1981) (Rehnquist, J., dissenting from denial of certiorari) (suggesting that the language of section 501(c)(3), interpreted in its "ordinary, everyday sense," does not support the Green court's construction of the statute).
 
 
 [41]
 Cf. Bittker & Kaufman, supra note 5, 82 Yale L.J. at 78 (distinguishing between the case of private schools addressed in Green, where "the tax allowances under attack would inure to the benefit of a racially restricted group," and cases in which a racially restricted group sponsors and administers charitable activities, but the activities themselves are open equally to all persons regardless of race)
 
 
 [42]
 See pp. 824-826 supra
 
 
 [43]
 Hearings, supra note 1, at 5 (statement of Jerome Kurtz)
 
 
 [44]
 Congressional subcommittees had been reviewing the proposed guidelines at the time the issue was brought directly to the House floor through the appropriations act amendment device. See Hearings, supra note 1; Tax-Exempt Status of Private Schools: Hearings on S.103, S.449, S.990, S.995 Before the Subcomm. on Taxation and Debt Management of the Senate Comm. on Finance, 96th Cong., 1st Sess. (1979). See also Note, supra note 38, 93 Harv.L.Rev. at 383-84, 392. Since the 1979 congressional action by appropriations act riders, the regular tax-writing committees of the House and Senate have not further reviewed the Commissioner's action or proposed action in this area, nor have they ventured to formulate other standards for the administration of sections 501(c)(3) and 170(c). Brief for the Federal Appellees at 32. See also note 61 infra
 
 
 [45]
 See 125 Cong.Rec. H5882 (daily ed. July 13, 1979) (remarks of Rep. Ashbrook)
 
 
 [46]
 For criticism of this mode of legislating, raising constitutional, policy, and practical problems the technique entails, see Parnell, supra note 36; Note, supra note 38, 93 Harv.L.Rev. at 390-92
 
 
 [47]
 See notes 36-38 supra and authorities cited therein
 
 
 [48]
 On a later day, at a time when the House was not debating any rider, Representative Ashbrook delivered an address in which he maintained that he did indeed intend his appropriations rider to halt court as well as IRS action. See 126 Cong.Rec. H5197, H5198 (daily ed. June 18, 1980). However, he thereafter acknowledged that his earlier statement accurately reflected the effect of the rider. He disavowed any purpose to challenge a court order and said, particularly: "There is an orderly process which was followed in Mississippi (in the Green case) where the courts or IRS can become involved. I did not change that in any way." Id. at H7291 (daily ed. Aug. 20, 1980). See also the ruling of the Chairman, declaring in order House consideration of the Dornan amendment in connection with fiscal year 1981 appropriations: "With reference to the court order issue, the language of the amendment does not in any way speak to the question of court orders or address the viability of court orders with regard to the agency's actions." Id. at H7212 (daily ed. Aug. 19, 1980). Accord, id. at H7293 (daily ed. Aug. 20, 1980) (remarks of Rep. Panetta)
 
 
 [49]
 Green v. Miller, No. 1355-69 (D.D.C. May 5, 1980) (clarified and amended June 2, 1980)
 
 
 [50]
 See 126 Cong.Rec. H5193, H5195 (daily ed. June 18, 1980) (remarks of Rep. Ashbrook); id. at H7214 (daily ed. Aug. 19, 1980)
 
 
 [51]
 Cf. 126 Cong.Rec. H5195 (daily ed. June 18, 1980) (remarks of Rep. Stokes) (noting the irrationality of maintaining one regime for Mississippi private schools, another for private schools elsewhere in the country)
 
 
 [52]
 Defendants and intervenor do not suggest, nor did the district court, that the Declaratory Judgment Act, 28 U.S.C. § 2201 (1976), which excludes suits "with respect to Federal taxes," or the Tax Injunction Act, 26 U.S.C. § 7421(a) (1976), which bars suits to enjoin the assessment or collection of taxes, precludes this litigation. Dismissal on the basis of these statutes, and a sovereign immunity bar, were urged, unsuccessfully, in Eastern Kentucky Welfare Rights Organization v. Simon, 506 F.2d 1278 (D.C.Cir.1974), vacated and remanded on other grounds, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), and McGlotten v. Connally, 338 F.Supp. 448, 452-54 (D.D.C.1972) (three-judge court). A suit to restrain the allowance of tax benefits falls outside the literal reach of § 7421(a). Moreover, cases of this nature, ultimately raising nonfrivolous constitutional objections to IRS action, are "few and far between"; they do not threaten large interference by "public interest" litigants with the administrative process of collecting taxes. See Bittker & Kaufman, supra note 5, 82 Yale L.J. at 55
 
 
 [53]
 Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958) (decision to initiate proceedings to fix new tolls pursuant to statutory formula is left to agency expertise); American Society of Travel Agencies, Inc. v. Simon, 75-1 U.S.T.C. P 9484 (D.D.C.1975), aff'd, 566 F.2d 145 (D.C.Cir.1977), cert. denied, 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978) (declining competitors' request for court review of IRS treatment of income American Jewish Congress derived from travel programs). Neither case involved challenges to agency action alleged to derive ultimately from constitutional concerns that courts, as opposed to administrators, are better equipped to address. Cf. Prince Edward School Foundation v. United States, --- U.S. ----, 101 S.Ct. 1408, 1410, 67 L.Ed.2d 376 (1981) (Rehnquist, J., dissenting from denial of certiorari). On pragmatic grounds, both decisions concluded that disposition appropriately resided in expert administrative officials without court oversight. The authority most directly in point, Green v. Connally, is not mentioned in the portion of the district court's decision holding this case unsuitable for judicial review
 
 
 [54]
 Green v. Connally accepts this thesis. For discussion in commentary, compare Note, supra note 38, and Comment, Tax Incentives as State Action, 122 U.Pa.L.Rev. 414 (1973), with Bittker & Kaufman, supra note 5, 82 Yale L.J. at 75-79 (distinguishing Green, based on the strength and clarity of the policy against racially restricted education and the benefit tax allowances confer on the school, from McGlotten v. Connally, involving fraternal orders, where freedom of association concerns loomed larger and no showing was made that the fruits of the philanthropy in question were distributed on a racially restrictive basis)
 The Service observes, citing Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), that "the Court held that a grant of tax exemption to churches did not amount to an establishment of religion." Brief for the Federal Appellees at 19. As Norwood succintly explains, "(t)he leeway for indirect aid to sectarian schools has no place in defining the permissible scope of state aid to private racially discriminatory schools." 413 U.S. at 464 n. 7, 93 S.Ct. at 2810 n.7. See id. at 470, 93 S.Ct. at 2813.
 
 
 [55]
 The precise statutory and constitutional questions plaintiffs raise have not yet been addressed by the Supreme Court. See Prince Edward School Foundation v. United States, --- U.S. ----, 101 S.Ct. 1408, 67 L.Ed.2d 376 (1981) (Rehnquist, J., dissenting from denial of certiorari)
 
 
 [56]
 As intervenor candidly notes, the current IRS guidelines, embodied in Rev.Proc. 75-50, 1975-2 C.B. 587, were adopted from the court's 1971 injunctive order in Green. Brief for Intervenor-Appellee at 26 n.7
 
 
 [57]
 See Green v. Miller, No. 69-1355 (D.D.C. May 5, 1980) (clarified and amended June 2, 1980)
 
 
 [58]
 Confronted with genuine cases and controversies, federal judges have been required to deal with situations presenting remedial problems far more complex and difficult than the one this case presents. See generally Johnson, In Defense of Judicial Activism, 28 Emory L.J. 901 (1979); Chayes, The Role of the Judge in Public Law Litigation, 89 Harv.L.Rev. 1281 (1976); Special Project, The Remedial Process in Institutional Reform Litigation, 78 Colum.L.Rev. 784 (1978); Note, Implementation Problems in Institutional Reform Litigation, 91 Harv.L.Rev. 428 (1977)
 
 
 [59]
 Intervenor so remarked at congressional hearings. See Hearings, supra note 1, at 388-89 (remarks of W. Wayne Allen)
 
 
 [60]
 As discussed in the preceding section, Congress acted to stay further IRS initiatives
 
 
 [61]
 The House Committee on Appropriations recommended holding the Service proposals in abeyance "until the appropriate legislative committees have had a chance to evaluate them." H.R.Rep. No. 248, 96th Cong., 1st Sess. 15 (1979). The federal appellees inform us that those committees have "shown no inclination" to proceed with the evaluation. Brief for the Federal Appellees at 32. Cf. 126 Cong.Rec. H7212, H7213 (daily ed. Aug. 19, 1980); id. at H7293 (daily ed. Aug. 20, 1980) (remarks of Reps. Gradison and Panetta, criticizing Congress for failure to address the issue through the regular lawmaking process)
 
 
 [62]
 The order and permanent injunction in Green v. Miller has no preclusive effect in this action. The district court retains jurisdiction in that action; intervenor here did not participate in Green ; no fact findings or legal conclusions accompany the May 1980 order and permanent injunction in Green. Moreover, a decision on the merits for plaintiffs in this lawsuit, and the decisions and orders in Green, while they would count as relevant precedent, would not preclude challenges to IRS action by schools not party to the litigation. See 26 U.S.C. § 7428 (declaratory judgment relating to tax-exempt status); Restatement (Second) of Judgments §§ 41 (Tent. Draft No. 1, 1973), 78(3) (Tent. Draft No. 2, 1975), 68, 68.1 (Tent. Draft No. 4, 1977), 88 (Tent. Draft No. 3, 1976)
 
 
 [1]
 The majority opinion expresses the view that lower courts are bound by Supreme Court summary affirmance of a decision even as to issues that were not addressed in that decision, as long as a contrary decision on that issue would preclude affirmance. Such a view is directly contrary to the Court's statements concerning the precedential value of its summary affirmances. See, e. g., Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 180-83, 99 S.Ct. 983, 988-90, 59 L.Ed.2d 230 (1979); Mandel v. Bradley, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977) (per curiam); Fusari v. Steinberg, 419 U.S. 379, 388-89 n.15, 95 S.Ct. 533, 539-40 n.15, 42 L.Ed.2d 521 (1975). Chief Justice Burger has taken special care to point out that such a disposition "is not to be read as a renunciation by this Court of doctrines previously announced in our opinions after full argument." Id. at 390, 392, 95 S.Ct. at 540, 541 (Burger, C. J., concurring). The court today acts contrary to this admonition in employing the summary affirmance of Green as support for its view of the law of standing
 The majority's innovative view of precedent, especially questionable in light of the Service's reversal of position prior to the affirmance in Green, is to be deplored as a statement of jurisprudential principle. See Note, Summary Disposition of Supreme Court Appeals: The Significance of Limited Discretion and a Theory of Limited Precedent, 52 B.U.L.Rev. 373, 410 (1972). Such a statement is also regrettable when it substitutes for analysis of the issue before us. The court may well, however, simply discard such a view in the future when it finds it politic to do so. Cf. Note, supra, at 386.
 Ultimately, this declaration of Green as binding precedent on the issue of standing is of no relevance to the case at hand. The allegations of injury made in this case, and the claim for relief pressed by plaintiffs here, differ substantially from those made in Green. Thus, even if it were binding, it would still not be precedent. See note 5 and text following infra.
 
 
 [2]
 I emphasize that this case involves neither a situation in which reconsideration of an older Supreme Court precedent is requested of this court, Breakefield v. District of Columbia, 442 F.2d 1227 (D.C.Cir.1970) (per curiam), cert. denied, 401 U.S. 909, 91 S.Ct. 871, 27 L.Ed.2d 807 (1971), nor, as the majority apparently believes, a situation concerning the binding precedential effect of Supreme Court summary dispositions of cases within its appellate jurisdiction. Hicks v. Miranda, 422 U.S. 332, 343-45, 95 S.Ct. 2281, 2288-90, 45 L.Ed.2d 223 (1975). See generally Russell v. Hathaway, 423 F.Supp. 833, 836 (N.D.Tex.1976) (three-judge court)
 
 
 [3]
 In the ordinary case, such prior rulings are not binding
 Where a jurisdictional challenge is repeated, however, as is the case where standing is in issue, the "law of the case" requirement is less rigid. Earlier jurisdictional rulings are entitled to important, but not dispositive weight ... If it can be shown that controlling authority has subsequently taken a clearly contrary view of the issue, then the renewed motion to dismiss for lack of jurisdiction may be appropriately filed and may prevail.
 Common Cause v. Bolger, 512 F.Supp. 26 at 28 (D.D.C. 1980) (three-judge court). See also Bowman v. Udall, 243 F.Supp. 672, 677 (D.D.C. 1965), aff'd sub nom. Hinton v. Udall, 364 F.2d 676 (D.C.Cir.), cert. denied, 385 U.S. 878 (1966).
 
 
 [4]
 One commentator pointed to this opinion as an example of the way in which "(c)ourts typically fail explicitly to identify the relevant standing criteria." Note, The Judicial Role in Attacking Racial Discrimination in Tax-Exempt Private Schools, 93 Harv.L.Rev. 378, 386 n.44 (1979)
 
 
 [5]
 The essential distinction, therefore, between these cases and the one at hand is the predicate of discrimination established in both cases. This predicate was also established in Green. Upon the granting of temporary injunctive relief, the three-judge court adopted the contemporaneous findings made by a Mississippi federal court in Coffey v. State Educ. Finance Comm'n, 296 F.Supp. 1389 (S.D.Miss.1969). Green v. Kennedy, 309 F.Supp. at 1134. The Mississippi court had found that certain named private schools had been formed for the purpose of frustrating the court-ordered desegregation of the public schools in that state. More to the point, however, is the conclusive evidence offered by that court's opinion of the racially discriminatory admissions policies of a large number of Mississippi private schools. Coffey, 296 F.Supp. at 1393 (Appendix A). No allegation of discriminatory practices or policies is made by the plaintiffs before us
 Another more recent decision is also distinguishable on this basis. Moton v. Lambert, 508 F.Supp. 367 (N.D.Miss.1981). In this case plaintiffs sought injunctive relief against state assistance to allegedly racially discriminatory schools. See Second Amended Complaint, filed Feb. 13, 1981, in Moton v. Lambert.
 
 
 [6]
 Analysis of this question often takes place under the rather undifferentiated concept of "personal stake." See, e. g., Citizens Concerned For Separation of Church and State v. City and County of Denver, 628 F.2d 1289, 1297 (10th Cir. 1980); NAACP, Boston Chapter v. Harris, 607 F.2d 514, 523 (1st Cir. 1979). This phrase is totally absent from the majority opinion
 However the question is approached, this court has made clear that "the basic concern of the standing doctrine is that the individual complaining party have such a strong connection to the controversy that its outcome will demonstrably cause him to win or lose in some measure." Harrington v. Bush, 553 F.2d 190, 206 (D.C.Cir.1977). As I explain infra, these plaintiffs have failed to allege any such connection.
 
 
 [7]
 See generally Comment, Community Resistance to School Desegregation: Enjoining the Undefinable Class, 44 U.Chi.L.Rev. 111 (1976). Once private discrimination is established, of course, this "interference" in the form of a tax exemption can be enjoined should it be found to constitute "state action." This question was not passed upon by the district court and is not before us today. See generally Bittker and Kaufman, Taxes and Civil Rights: "Constitutionalizing" the Internal Revenue Code, 82 Yale L.J. 51, 61-74 (1972)
 
 
 [8]
 I have noted elsewhere that the allegation that the government funds unlawful discrimination "without regard to whether (the plaintiffs) personally are victims of the discrimination" does not constitute a distinct and palpable injury sufficient to confer standing to sue in the federal courts. Nat'l Black Police Ass'n v. Velde, 631 F.2d 784, 788, 789-90 n.7 (D.C.Cir.1980) (Tamm, J., concurring in part, concurring in result in part, and dissenting in part), cert. granted, --- U.S. ----, 101 S.Ct. 2044, 68 L.Ed.2d 347 (1981). Because the plaintiffs in this case fail to allege unlawful discrimination on the part of any school, I need not decide the question of whether a named plaintiff must have himself been subjected to discriminatory practices or whether the right to a court-ordered desegregated education affords him the "personal stake" necessary for the invocation of federal judicial relief
 
 
 [9]
 Judge Robinson dissented only with respect to the standing of the plaintiff allegedly denied employment, finding the remainder of the court's discussion "in accord with the Supreme Court's recent teachings ...." 575 F.2d at 949 n.7 (Robinson, J., dissenting). The dissent went on to note, however, that "(p)erhaps the standing of citizens or taxpayers who have suffered a widely-shared injury and who are interested enough to commit their resources to a suit should be recognized when possibly unlawful action would otherwise go unreviewed." Id. The court today apparently implements this desire
 
 
 [10]
 Even apart from this impermissible orientation, the majority opinion errs in seizing upon language in Norwood to delineate the constitutional right asserted in this case. Black citizens, indeed all citizens, possess the constitutional right to be free from unlawful discrimination. The court decides today that all black citizens possess the right to insist that the government "steer clear" of aiding any such discrimination. In my opinion the Constitution neither requires the government to take this driving test at the behest of every black citizen, nor does it permit a federal court to grade such a test
 The Constitution does require, of course, in a case appropriate for judicial resolution, that a federal court enjoin state action that significantly contributes to racial discrimination. See note 7 supra. That is not this case.
 
 
 [11]
 Because I believe that the judgment of the district court should be affirmed on the grounds of lack of standing, I do not address the correctness of the remainder of the district court opinion. See maj. op. at 832-838. I trust, however, that the majority's passing comments on the scope of the Declaratory Judgment Act, 28 U.S.C. § 2201 (Supp. III 1979), and the Tax Injunction Act, 26 U.S.C. § 7421(a) (Supp. III 1979), maj. op. at 836 n.52, are not meant to decide these questions. See maj. op. at 822 n.2. I do believe, moreover, that the considerations addressed by the district court, 480 F.Supp. at 797-99, caution against the finding of federal court jurisdiction and certainly fail to support the court's pell-mell rush to grasp jurisdiction and reach the merits of this case. See Winpisinger v. Watson, 628 F.2d 133, 137-40 (D.C.Cir.1980) (per curiam)
 
 
 [12]
 The defendant in this case may be quite willing to respond to the district court's decree. Although the Service possesses certain jurisdictional objections to the granting of injunctive relief in this case, of which the plaintiffs' standing was primary, it does agree with plaintiffs that more effective enforcement procedures are warranted. If both named parties desire the same result, of course, no Article III case or controversy exists. GTE Sylvania, Inc. v. Consumers Union, 445 U.S. 375, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980); Moore v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 47, 91 S.Ct. 1292, 28 L.Ed.2d 590 (1971) (per curiam); Granfield v. Catholic Univ. of America, 530 F.2d 1035, 1044-45 (D.C.Cir.), cert. denied, 429 U.S. 821, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976); NAACP v. California, 511 F.Supp. 1244 (E.D.Cal.1981)
 The majority opinion takes pains to emphasize that a "strong advocate of the private schools" is participating in this case. Maj. op. at 828. It is apparent, however, that "(i)ntervention cannot cure any jurisdictional defect that would have barred the federal court from hearing the original action. Intervention presupposes the pendency of an action in a court of competent jurisdiction and cannot create jurisdiction if none existed before." Wright & Miller, Federal Practice and Procedure: Civil § 1917 at 584 (1972) (footnotes omitted). See ICC v. Southern Railway, 380 F.Supp. 386, 394-95 (M.D.Ga.1974), aff'd in relevant part, 543 F.2d 534 (5th Cir. 1976). Because this particular question requires close scrutiny and has not been raised before, however, I would not decide it at this time but leave it for the judgment of the district court in the first instance. Past indications suggest that the IRS might well welcome court-ordered enforcement of standards similar to those imposed in Green imposed nationwide. See, e. g., Tax-Exempt Status of Private Schools: Hearings Before the Subcomm. on Oversight of the House Comm. on Ways and Means, 96th Cong., 1st Sess. 5-8 (1979) (statement of IRS Commissioner Jerome Kurtz); 44 Fed.Reg. 9451 (Feb. 13, 1979), reprinted in Hearings, supra, at 41; Memorandum Of Defendants In Response To Plaintiffs' Submission On The Merits at 25, Green v. Kennedy, No. 1355-69 (D.D.C. May 5, 1980). I note with some interest the failure of the Service to appeal from the granting of injunctive relief to the Mississippi plaintiffs in Green.
 
 
 [13]
 The logical result of the court's holding today is, for example, that female plaintiffs may be heard to complain simply that certain public programs are not being administered efficiently and thereby operate to discriminate against others of their sex. Requirements of specificity and of injury in fact are therefore no longer applicable. Cf. Ridgefield Women's Political Caucus, Inc. v. Fossi, 458 F.Supp. 117, 120 n.3 (D.Conn.1978)
 Today's decision cannot be interpreted as merely an attempt to carve out an exception to the apparent ban against public interest tax litigation imposed in Eastern Kentucky. Eastern Kentucky, 426 U.S. at 26, 46, 96 S.Ct. at 1919, 1928 (Stewart, J., concurring). See generally Asimow, Standing to Challenge Lenient Tax Rules: A Statutory Solution, 57 Taxes 483 (1979); Tannenbaum, Public Interest Tax Litigation Challenging Substantive IRS Decisions, 27 Natl.Tax J. 373 (1974). Rather, the analysis employed in today's decision, relying as it does upon the binding effect of Norwood and Gilmore, neither of which involved tax exemptions, necessarily applies to all charges of unlawful discrimination and, it would seem, to all alleged violations of constitutional rights.
 
 
 [14]
 See, e. g., Lamar v. Whiteside, 606 F.2d 88 (5th Cir. 1979) (per curiam) (prison inmates lack standing to challenge hiring discrimination by parole officials); Mulqueeny v. Nat'l Comm'n on the Observance of Int'l Women's Year, 1975, 549 F.2d 1115 (7th Cir. 1977) (interest in defeat of the Equal Rights Amendment cannot suffice to confer standing to attack alleged lobbying activities by the Commission in support of the Amendment); Urban Contractors Alliance v. Bi-State Dev. Agency, 531 F.2d 877 (8th Cir. 1976) (allegations of racial discrimination insufficient to confer standing absent allegations of personal injury). But see Coles v. Havens Realty Corp., 633 F.2d 384 (4th Cir. 1980) (plaintiffs have standing as "testers" under the Fair Housing Act to challenge racial discrimination in the rental of housing accommodations), cert. granted sub nom. Havens Realty Corp. v. Coleman, --- U.S. ----, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1981)