# Defending the Revocation of the Tax-Exempt Status of Certain Private Schools in Light of the Ashbrook Amendment

The Ashbrook amendment's limitation on the expenditure of appropriated funds by the Internal Revenue Service (IRS) on actions that would cause the revocation of a school's tax-exempt status applies only prospectively, and revocation notices issued prior to its effective date thus remain valid.

A bar on the expenditure of appropriations which does not amend underlying substantive law will not lightly be interpreted to prohibit the Executive from appearing in court to defend legally authorized actions previously taken.

Neither the plain language nor the legislative history of the Ashbrook amendment suggests a congressional intent to bar IRS from defending its valid revocation notices in a court proceeding, though the manner in which IRS defends its revocation notices may be relevant to whether it is complying with the spirit as well as the letter of the Ashbrook amendment.

December 24, 1981

## MEMORANDUM OPINION FOR THE GENERAL COUNSEL, DEPARTMENT OF THE TREASURY

In connection with our analysis of the ramifications of the Ashbrook amendment, § 616 of H.R. 4121, 97th Cong., 1st Sess. (1981), for future actions of the Department of the Treasury, you have requested an early response to the question whether your Department may engage in certain pending litigation. Specifically, may the Internal Revenue Service (IRS), through its Office of the Chief Counsel, consistent with the Ashbrook amendment, answer and defend petitions filed in the United States Tax Court by five formerly tax-exempt nonsectarian private schools challenging the revocation of their tax-exempt status under § 501(c)(3) of the Internal Revenue Code of 1954 (Code) 26 U.S.C. § 501(c)(3)? The notices of revocation, dated August 17, 1981, concluded that each of the five schools "no longer qualifies for continued exemption under section 501(c)(3)." These revocations occurred at a time when the IRS was, as it continues to be, subject to an injunction issued by the district court in *Green* v. *Miller*, No. 69–1355 (D.D.C. May 5, 1980) (clarified and amended June 2, 1980), the general thrust of which is to require the IRS to enforce more vigorously the implied prohibition in § 501(c)(3) on the eligibility for tax-exempt status of private, nonprofit schools which discriminate on the basis of race.

We do not, in this memorandum, attempt to resolve the plethora of complex questions—including those articulated by Secretary Regan in his letter to the Attorney General dated October 1, 1981—raised by the Ashbrook amendment. The Supreme Court may resolve some of these questions in the cases of *Goldsboro Christian Schools, Inc.* v. *United States* and *Bob Jones University* v. *United States, cert. granted,* 454 U.S. 892 (1981), and *Regan* v. *Wright.* * For present purposes, we shall simply assume, without reaching questions of constitutionality, that the Ashbrook amendment was intended, at least in part, to restrict your Department's ability to comply with the injunction issued in *Green* v. *Miller.* We conclude, for the reasons set forth below, that the IRS may file answers to and defend the five petitions without violating any constraints the Ashbrook amendment may otherwise have placed on the IRS' administration of the Code.

## I. Background

The history of the *Green* and *Wright* cases, and their interrelationship with the Ashbrook amendment, is extraordinarily complex.[1] However, a detailed recapitulation of that history is unnecessary for resolution of the present problem. Briefly, prior to 1970, the IRS as a general rule recognized non-profit private schools not receiving state aid as tax-exempt, charitable institutions under § 501(c)(3) of the Code and as eligible donees of charitable contributions deductible under § 170(a) and (c)(2) of the Code regardless whether the school was racially discriminatory. In 1971, the district court in *Green* v. *Connally,* 330 F. Supp. 1150, 1171, 1179 (D.D.C.) (three-judge court), *aff'd mem. sub nom. Coit* v. *Green,* 404 U.S. 997 (1971), held, as a matter of statutory interpretation, that the Internal Revenue Code requires denial of tax-exempt status and deductibility of contributions to private schools practicing racial discrimination.[2] Plaintiffs in *Green* reopened the litigation in 1976, alleging that the IRS had failed to enforce effectively the earlier order that racially discriminatory private schools in Mississippi be denied tax-exempt status.[3] That action resulted in a modified and ampli-

---

*Note. The Supreme Court's opinion in *Bob Jones University* v. *United States* is printed at 461 U.S. 574 (1983); its opinion in the *Wright* case appears at __ U.S. __, 104 S. Ct. 3315 (1984), *sub nom. Allen* v. *Wright.* Ed.

[1] *See Wright* v. *Regan,* 656 F.2d 820, 823-26 (D.C. Cir.) (1981) (detailing history of the case); Note, *The Judicial Role in Attacking Racial Discrimination in Tax-Exempt Private Schools,* 93 Harv. L. Rev. 378, 379-84 (1979). *See also* Neuberger & Crumplar, *Tax Exempt Religious Schools Under Attack: Conflicting Goals of Religious Freedom and Racial Integration,* 48 Fordham L. Rev. 229 (1979) (general discussion of court, agency, and congressional action in this area).

[2] To support this determination, the court reasoned that with respect to private schools, § 501(c)(3) must be read in a manner consistent with federal civil rights legislation and the overriding national policy against racial discrimination in educational facilities. *See also Runyon* v. *McCrary,* 427 U.S. 160 (1976); *Brown* v. *Board of Education,* 347 U.S. 483 (1954); § 1 of the Civil Rights Act of 1866, 14 Stat. 27, 42 U.S.C. § 1981; Pub. L. No. 94-568, Sec. 2(a), 90 Stat. 2697 (1976) (prohibition of tax-exempt status for social club whose charter or governing instrument provides for discrimination).

[3] At the same time, parents of black children in desegregating school districts in seven states commenced a class action seeking nationwide relief on a basis similar to that sought in Mississippi in

Continued

fied injunction against the IRS which went beyond the guidelines the IRS had adopted in the wake of the first *Green* decision to determine whether schools seeking or holding exempt status are in fact discriminatory.[4] The district court enjoined the IRS from granting tax-exempt status to private Mississippi schools: (1) adjudged racially discriminatory in adversary or administrative proceedings; or (2) established or expanded at the time of local public school desegregation *unless* the schools "clearly and convincingly" demonstrate that they observe non-discriminatory policies and practices in "admissions, employment, scholarships, loan programs, athletics and extra-curricular programs." *Green* v. *Miller,* No. 69-1355, at 2 (D.D.C. May 5, 1980) (clarified and amended June 2, 1980).[5] Subsequent to the court order, the IRS, in the course of its surveys and examinations of private schools, sent the five notices of revocation of tax-exempt status that are presently being challenged in the Tax Court under 26 U.S.C. § 7428.[6]

In order to determine whether those actions can now be answered and defended in Tax Court, they must be viewed against the backdrop of the Ashbrook amendment. Section 616, which Congressman Ashbrook offered as an amendment to the Treasury Department, Postal Service, and General Government Appropriations Bill for the fiscal year 1982, provides:

> None of the funds made available pursuant to the provisions of this Act shall be used to formulate or carry out any rule, policy, procedure, guideline, regulation, standard, court order, or measure which would cause the loss of tax-exempt status to private, religious, or church-operated schools under section 501(c)(3) of the Internal Revenue Code of 1954 unless in effect prior to August 22, 1978.

Section 616 passed the House on July 30, 1981. *See* 127 Cong. Rec. H5398 (daily ed. July 30, 1981). It was approved by the Senate Committee on Appropriations on September 15, 1981. *See* 127 Cong. Rec. D1057 (daily ed. Sept. 15, 1981). Although the House bill has not yet

---

the reopened *Green* case. *See Wright* v. *Regan,* 656 F.2d 820, 825, 829-30, 835 (D.C. Cir. 1981). While *Green* has a long history and involves Mississippi schools alone, the issues in the two cases are essentially the same. Moreover, the original *Green* court specifically noted that its interpretation of § 501(c)(3) was not confined to the situation in Mississippi. Rather "[t]he underlying principle is broader, and is applicable to schools outside Mississippi with the same or similar badge of doubt." *Green* v. *Connally,* 330 F. Supp. at 1174. The Ashbrook amendment does not, on its face, distinguish between schools inside and outside Mississippi.

[4] *See, e.g.,* Rev. Proc. 72-54, 1972-2 C.B. 834; Rev. Proc. 75-50, 1975-2 C.B 587.

[5] The district court has subsequently stayed its order insofar as it applies to private sectarian schools. *See* Suspension of Court's Orders of May 5, 1980, and June 2, 1980 (D.D.C. July 13, 1981).

[6] Section 7428 of Title 26 provides that an organization whose qualification, or classification under § 501(c)(3) is in issue may file within 90 days a petition in the United States Tax Court, the United States Court of Claims, or the district court of the United States for the District of Columbia, seeking a declaratory judgment with respect to such initial qualification, continuing qualification, or revocation.

been enacted, the restrictions contained in § 616 were temporarily effective from October 1, 1981, until November 20, 1981, pursuant to Pub. L. No. 97-51, 95 Stat. 958 (1981), the continuing Appropriations Act. That Act was extended, by amendment, to December 15, 1981. *See* Pub. L. No. 97-85, 95 Stat. 1098 (1981). On December 15, a joint resolution further extending these conditions for fiscal year 1982, became law. *See* Pub. L. No. 97-92, 95 Stat. 1183 (1981).[7]

Section 616 is Congress' most recent attempt to limit what it perceives to be unwarranted governmental interference with private sectarian and nonsectarian schools. The amendment is substantially similar to amendments sponsored by Congressmen Ashbrook and Dornan to Treasury appropriations for fiscal years 1980 and 1981.[8] These "riders" were intended to preserve guidelines the IRS had adopted prior to August, 1978 to identify racially discriminatory private schools and to prevent the IRS from augmenting those guidelines with more aggressive procedures and detailed reporting requirements. *See* 125 Cong. Rec. 18,444-50 (1979); *id.* at 18812-16 (1979); *id.* at 22,876-928 (1979); *id.* at 23,204-11 (1979); 126 Cong. Rec. 15,383 (1980); *id.* at 21,981-90 (1980); *id.* at 22,166-70 (1980). Originally, these provisions were explained as attempts to rechannel the responsibility for formulating tax policy from the IRS to Congress or the courts,[9] and they have been so interpreted by a court.[10]

The fiscal year 1982 Ashbrook amendment differs, however, in scope and impact: the earlier language was altered by inserting "court order."[11] Inasmuch as the Ashbrook amendment can now be read on its face to prohibit the use of appropriations to "carry out any . . . court order . . . which would cause the loss of tax-exempt status . . . unless in effect prior to Aug. 22, 1978," there may be conflicts between § 616 and the obligations of the IRS under the modified *Green* injunction. The specific potential conflict at issue here is whether § 616 affects the IRS's ability to defend the actions brought in the Tax Court.

---

[7] Similar to Pub. L. No 97-51, a proviso to § 101(a)(3) of Pub. L. No. 97-92 states that "when an Act listed in this subsection has been reported to a House, but not passed by that House as of December 15, 1981, it shall be deemed as having been passed by that House." The Treasury, Postal Service, and General Government Appropriations Act of 1982 is listed in subsection (a) and has been reported to the floor of the Senate by the Senate Committee on Appropriations. Thus, the amendment involved here is now effective.

[8] *See* Treasury, Postal Service, and General Government Appropriations Act, 1980, Pub. L. No. 96-74, 93 Stat 559, §§ 103, 615 (1979); restriction reinstated on December 16, 1980, effective through September 30, 1981, Pub. L. No. 96-536, 94 Stat. 3166, §§ 101(a)(1), 101(a)(4) (1980); as amended Pub. L. No. 97-12, 95 Stat. 95, § 401 (1981).

[9] *See* 125 Cong. Rec. 18,447 (1979) (remarks of Rep. Ashbrook).

[10] *See* *Wright* v. *Regan.* 656 F.2d 820, 835 (D.C. Cir. 1981) ("riders are holding orders and they hold only the IRS, they do not purport to control judicial dispositions."), petition for *certiorari* filed, *Regan* v. *Wright,* No. 81-970 (Nov. 23, 1981).

[11] *See* 127 Cong. Rec. H5392, 5398 (daily ed. July 30, 1981).

## III. Analysis

The first question to be addressed is whether the notices of revocation sent out by the IRS on August 17, 1981, are themselves nullified by the Ashbrook amendment, which became operative on October 1, 1981. The plain language of § 616 does not indicate that it should apply retroactively. As written, it is future-oriented: no appropriations "shall be used," not "no appropriations should have been used." Nor could a provision forbidding the use of appropriations logically be read to make prior expenditures illegal. Were that possible, persons who had properly authorized the obligation of appropriations under the previous law could be subjected, *ex post facto,* to criminal prosecution under the Antideficiency Act, 31 U.S.C. § 665, in violation of the Constitution. U.S. Const., Art. I, § 9, cl. 3.[12]

In addition, a general rule of statutory construction is that retroactive application of statutes is not assumed absent explicit congressional intent to the contrary. *See Nichols* v. *Coolidge,* 274 U.S. 531, 542 (1927) (tax which applied retroactively so as to burden past lawful transactions violated Fifth Amendment); *Billings* v. *United States,* 232 U.S. 261, 282 (1914) (statutes should be so construed as to prevent them from operating retroactively). We have carefully reviewed the legislative history and find no evidence whatsoever that Congress intended § 616 to apply

---

[12] We note that the Ashbrook amendment to the 1980 Appropriations Act, which was the governing law prior to October 1, 1981, did not prohibit any actions taken pursuant to a court order. (Section 103 of the Treasury, Postal Service, and General Government Appropriations Act, 1980, Pub. L. No. 96–74, 93 Stat. 562, expired on September 30, 1980, the end of the 1980 fiscal year, but was reinstated for the period December 16, 1980, through the close of the 1981 fiscal year, by § 101(a)(4), H.R. J. Res. 644 of Dec. 16, 1980, Pub. L. No. 96–536, 94 Stat. 3166, as amended by § 401, Supplemental Appropriations and Rescission Act, 1981, Pub. L. No 97–12, 95 Stat. 95.) That section read:

> None of the funds made available pursuant to the provisions of this Act shall be used to formulate or carry out any rule, policy, procedure, guideline, regulation, standard, or measure which would cause the loss of tax-exempt status to private, religious, or church-operated schools under section 501(c)(3) of the Internal Revenue Code of 1954 unless in effect prior to August 22, 1978.

When Congressman Ashbrook initially proposed § 103, he described it as a holding order on the IRS, not the courts. "We are just saying do not go forward with these broad regulations or procedures, . . . until the Congress or a court affirmatively acts on that subject." 125 Cong. Rec. 18,447 (1979) (remarks of Rep. Ashbrook). Thus, neither the plain language nor the legislative history of the 1980 fiscal year Ashbrook amendment—the applicable law on August 17, 1981—prohibited sending out the revocation letters.

Although Congressman Ashbrook attempted to expand the scope of his amendment a year later so as to affect court orders as well, the Chair ruled that the amendment was out of order. 126 Cong. Rec. 21,980 (1980). Congressman Ashbrook then offered an alternative version which was adopted by the House, with respect to which he stated: "The new version of the amendment does not challenge the May 5 *Green* order, . . . it does not address or seek to alter the order of Judge Hart in the *Green* case or the implementation of that order in the State of Mississippi." 126 Cong. Rec. 22,166 (1980). This amendment never became law, because Congress failed to pass the 1981 fiscal year Appropriations Act. Funding was authorized pursuant to a continuing budget resolution which incorporated existing 1980 restrictions, including the earlier Ashbrook amendment. But at no point prior to the appropriation rider for 1982 did Congress regard either the Ashbrook or Dornan amendments as interfering with the enforcement of outstanding court orders. *See also* 126 Cong. Rec. 17,508 (remarks of Sen. Javits) (1980); 126 Cong. Rec. at 21,983 (remarks of Rep. Dornan) (1980); *id.* at 21,984 (ruling of the Chair).

retroactively.[13] We therefore conclude that § 616 in no way affects the administrative actions taken by the IRS on August 17, 1981.[14]

The next question is whether the IRS can defend challenges to those revocation notices brought under 26 U.S.C. § 7428 and filed in the Tax Court on November 17, 1981. Under rules of the Tax Court, the IRS must respond to at least one of the five petitions by January 11, 1982. We understand from IRS attorneys that the proceedings before the Tax Court will be ones in which any facts upon which the administrative determinations were made may be determined *de novo* by the Tax Court at trial of the causes. Any relevant evidence supporting contentions raised during the administrative revocation process may be raised before the Tax Court by either the IRS or the organization. *See Incorporated Trustees of the Gospel Workers Society* v. *United States*, 81-1 USTC ¶ 9174, n.6 (D.D.C. 1981). *But cf. Prince Edward School Foundation* v. *C.I.R.*, 478 F. Supp. 107, 110 (D.D.C. 1979) *aff'd by unpublished order*, No. 79-1622, *cert. denied*, 450 U.S. 944 (1981) (judicial review limited to review for error of administrative determination). In its answers to the five petitions, the IRS expects to deny most of the paragraphs of the petitions. Trial would not be held in any of the cases until May 1, 1982, at the earliest, with legal memoranda to be submitted subsequent to the trial.

The plain language of § 616, while prohibiting the use of funds either to formulate rules and regulations or to carry out guidelines or court orders which were not in effect prior to August 22, 1978, does not address specifically the appearance of the Executive in court. We would generally be most reluctant to give § 616 a reading that Congress intended to bar the Executive from performing its quintessential function of appearing in court to support legally authorized actions it had previously taken. We would be particularly reluctant to give such a reading to a statute making appropriations (and, as here, denying the use of appropriations), because such a statute does not amend underlying substantive law—it merely suspends the use of appropriations for so long as the statute remains in force. It would also, we believe, be anomalous to attribute to Congress in 1981 an intent on the one hand to leave the notices of revocation unchanged and an intent on the other hand to prohibit the defense of those administrative notices in the Tax Court. Such potentially inconsistent effects should be resolved, if possi-

---

[13] *See* 127 Cong. Rec. H5392-98 (daily ed. July 30, 1981). Indeed, during floor debate over his 1982 fiscal year version, Congressman Ashbrook himself expressed doubts that even that proposal would affect the ability of the IRS to comply fully with the *Green* v. *Miller* injunction within the State of Mississippi *See* 127 Cong. Rec. H5394 (daily ed. July 30, 1981) (exchange between Reps. Ashbrook and Gradison). We assume for present purposes that the 1982 fiscal year version was intended to interdict compliance with the *Green* v. *Miller* order after October 1, 1981, without deciding that issue.

[14] Analogously, the court of appeals in *Wright* v. *Regan*, 656 F 2d at 832-35, reached a parallel conclusion that the enactment by Congress of the Ashbrook amendment (§ 103) and Dornan amendment (§ 615) to the Treasury, Postal Service, and General Government Appropriations Act, 1980, Pub. L No. 96-74, 93 Stat. 559, was prospective in operation: an attempt to stay further IRS initiatives.

ble, in favor of permitting the agency to defend its prior, permissible actions, rather than forcing a reading that would require the Executive to default in court. Moreover, our earlier conclusion—that Congress did not intend to nullify the letters of revocation—leaves the underlying substantive rule of law to be relied upon in the Tax Court outstanding. *Cf. Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421 (1855) (Congress explicitly changes the substantive rule of law supporting prior decision.). If neither § 501(c)(3) nor the notices of revocation have been amended or extinguished, it would be illogical to find in the Ashbrook amendment an intent to prohibit the Executive from responding to challenges to the revocation letters.

Notwithstanding these considerations, however, the complex history of the Ashbrook amendments suggests that we should examine the manner in which the defense in the Tax Court might be construed as carrying out a court order, namely the *Green* v. *Miller* injunction, entered *after* August 22, 1978, and therefore as potentially violative of the spirit of the Ashbrook amendment. Significantly, the modified *Green* v. *Miller* injunction does not mention the issue of the IRS defending actions in the Tax Court. Nor would the district court judge presume to dictate the proceedings in another tribunal. *Cf. GTE Sylvania, Inc.* v. *Consumers Union of the United States,* 445 U.S. 375 (1980) (agency complying with order in one court's proceeding should not be required to commit contempt of that court because of contradictory order from another court). The Tax Court functions independently in determining what legal standard should govern under the present circumstances and whether or not the petitioner organizations are tax-exempt. *See Prince Edward School Foundation* v. *C.I.R.,* 478 F. Supp. 107, 111–12 (D.D.C. 1979), *aff'd by unpublished order,* No. 79–1622 (D.C. Cir. June 30, 1980), *cert. denied,* 450 U.S. 944 (1981) (validity of particular revenue procedure does not bear on court's interpretation of the prerequisites for § 501(c)(3) status and its ultimate decision whether or not plaintiff is exempt under that section). Therefore, the IRS, as an initial matter, would not logically turn to the rules developed in the recent *Green* order for instruction as to its present defense to the challenges under 26 U.S.C. § 7428 in the Tax Court.

Several options, independent of the modified *Green* injunction and compatible with the Ashbrook amendment, would be available to the IRS in the Tax Court proceedings. The IRS could base its defense of the revocations on a determination that the schools involved have violated Rev. Proc. 75-50 or other pre-August 22, 1978, law, either by failing to demonstrate affirmatively the adoption, communication, and observance of a nondiscriminatory policy or by failing to fulfill the equivalent duty of a meaningful communication of a nondiscriminatory

policy.[15] Under this analysis, the IRS would take the position that the schools have allegedly failed to demonstrate that they operate on a racially nondiscriminatory basis in conformity with the original order in *Green* v. *Connally,* 330 F. Supp. 1150 (D.D.C.) (three-judge court) *aff'd sub nom. Coit* v. *Green,* 404 U.S. 997 (1971), and Rev. Proc. 75–50, both of which were consciously left undisturbed by the Ashbrook amendment.

It is also possible that, at some time during the litigation in the Tax Court, the IRS might desire to argue that the schools had not successfully rebutted a factual inference of discrimination raised by the circumstances surrounding their creation, or their substantial expansion, at approximately the time of a local desegregation order. While such a position could arguably be linked to the language of the modified *Green* v. *Miller* injunction, the IRS had actual knowledge of the relevant facts surrounding the schools' formation independent of that court order. *See Coffey* v. *State Educational Finance Commission,* 296 F. Supp. 1389 (S.D. Miss. 1969) (three-judge court); *Green* v. *Connally,* 330 F. Supp. at 1173–74; *Norwood* v. *Harrison,* 382 F. Supp. 921, 924–26 (N.D. Miss. 1974). These cases treated evidence of a school's formation or expansion at times reasonably proximate to public school desegregation litigation as sufficient to create a "badge of doubt." The IRS could assert this well-recognized and accepted inference in its present defense should it choose to rely on that inference.[16]

Another aspect of the Tax Court defenses which arguably could be viewed as "carrying out" the modified *Green* v. *Miller* injunction in violation of § 616 would involve the IRS' resort to the "clear and convincing" evidence standard that the modified *Green* decree imposes on the schools in order to overcome a *prima facie* case of discrimination. Of course, the IRS has no way of predicting exactly what burdens of proof the Tax Court might eventually place on the litigants.[17] We are informed that a "clear and convincing" standard of proof is extremely rare in Tax Court proceedings. Moreoover, as indicated above, the district court in *Green* in no way displayed a purpose to prescribe the rebuttal standard to be employed in the Tax Court.

---

[15] Rev. Proc. 75–50, Sec. 2.02 specifically requires that "[a] school must show affirmatively both that it has adopted a racially nondiscriminatory policy as to students that is made known to the general public and that since the adoption of that policy it has operated in a bona fide manner in accordance therewith." *See also Green* v. *Connally,* 330 F. Supp. 1150, 1179 (D.D.C. 1971) (three-judge court) (school must publicize policy in manner that is intended and reasonably effective to bring it to attention of students of minority groups).

[16] *See also Brumfield* v *Dodd,* 425 F. Supp. 528, 531–32 (E.D. La. 1977) (adopting *Norwood* v. *Harrison,* 382 F. Supp. 921, 925 (N.D. Miss. 1974), standard that "the critical time of a private school's formation or unusual enlargement must be a significant factor, though one not necessarily decisive, in determining whether it is racially discriminatory").

[17] *See Prince Edward School Foundation* v. *C.I.R., supra* at 110–11; *Western Catholic Church* v. *Commissioner,* 73 T.C. 196, 206 (1979); *Hancock Academy of Savannah, Inc.* v. *Commissioner,* 69 T.C. 488, 492 (1977) (burden of proof on petitioner; exact standard not addressed).

451

More importantly, should the IRS, to sustain its case, desire to argue that such a standard should control, it need not invoke the modified *Green* injunction to support its position. Rather, it can point to the burdens of proof developed in *Norwood* v. *Harrison,* 382 F. Supp. at 924–26, on remand from the Supreme Court, 413 U.S. 455, 471 (1973); an approach reaffirmed in *Brumfield* v. *Dodd,* 425 F. Supp. 528, 531–32 (E.D. La. 1977).[18] These cases predate August 22, 1978, and we do not read the Ashbrook amendment as intending to affect these decisions or to prohibit the IRS from arguing their relevance and applicability in the Tax Court proceedings. Given these precedents and the lack of a firm position by the IRS whether the *Norwood* inference should apply at all, we see no conflict, at least in the immediate future, between the Ashbrook amendment and the filing of an answer to the five petitions in the Tax Court or, generally, the defense of those actions.

At a more fundamental level, the IRS defense does not violate the basic thrust of § 616. Congress neither intended to change the law proscribing tax-exempt status for discriminatory schools nor desired to impinge on the IRS' ability to withdraw the tax-exempt status of schools that do discriminate. Indeed, in reiterating his initial intention this year, Congressman Ashbrook stated:

> I made it clear at the time that IRS should be able to proceed on the basis of the regulations they had in existence. If they know of discrimination, they can litigate, they can withdraw the tax-exempt status, anything that they could do prior to August 22, 1978, the time when they endeavored to implement these Draconian regulations, could be implemented by IRS. In no way am I trying to impinge on IRS's ability to withdraw the tax-exempt status of any school which might violate the law.

127 Cong. Rec. H5395-96 (daily ed. July 30, 1981).[19] These proceedings will give the court an opportunity to consider what rules should be used to determine nondiscrimination—a result sought by Congressman Ashbrook when he first introduced his amendment.[20] Thus, the Tax

---

[18] Similarly, the court in *United States* v. *State of Mississippi,* 499 F.2d 425, 434–35 & n.17 (5th Cir 1974) *(en banc)* interpreted *Norwood* to require that the litmus test for receiving governmental support was *actual* evidence of nondiscrimination, not a simple statement of a nondiscriminatory policy.

[19] *See also* 127 Cong. Rec. H5398 (daily ed. July 30, 1981) (remarks of Rep. Lott) ("If this amendment passes, the IRS will still be free to investigate charges of racial discrimination. It will be free to deny exemptions to any institution proven guilty of racial discrimination through fair hearings. In short, it will be free to enforce the regulations and court orders in effect in 1978.")

[20] The governing statute, 26 U.S.C. § 7428(c)(1), explicitly provides that any individual contributions up to $1,000 made to the school during the pendency of the proceedings are deductible, regardless of the eventual outcome of the litigation. Congress fashioned the proceeding involved here in response to the Supreme Court's suggestion that "[s]pecific treatment of not-for-profit organizations to allow them to seek pre-enforcement review" might be a method for alleviating "[t]he degree of bureaucratic control that, practically speaking, has been placed in the Service [and] . . . is susceptible of abuse, regardless of how conscientiously the Service may attempt to carry out its responsibilities." *Bob Jones University* v. *Simon,* 416 U.S. 725, 749–50 (1974). *See* H.R. Rep. No. 658, 94th Cong., 1st Sess. 282, 283–84 (1975); S. Rep. No. 938, 94th Cong., 2d Sess. 585–87 (1976) (basis for enacting § 1306(a), Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520).

Court proceedings function to further, rather than to undermine, the spirit of the Ashbrook amendment. We therefore conclude that the IRS defense in the Tax Court violates neither the letter nor the spirit of § 616.

We are continuing our review of other issues raised in the Secretary's letter to the Attorney General, particularly the potential effect of the Ashbrook amendment on the responsibility of the IRS to notify two "paragraph 1" schools [21] of their reporting obligations under the modified *Green* injunction. We will remain in touch with your office and IRS attorneys in our efforts to resolve this matter.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[21] Paragraph 1 schools are schools which in the past have been determined in court or administrative proceedings to be racially discriminatory, or were established or expanded at or about the time the districts in which they are located were undergoing desegregation and which cannot demonstrate that they do not presently discriminate. *See Green* v. *Miller,* No. 69-1355, Order and Permanent Injunction (D.D.C. May 5, 1980) (clarified and amended, June 2, 1980). Even if the school establishes that it observes a nondiscriminatory policy, the IRS is enjoined from continuing its tax-exempt status if the school fails to supply certain information annually for a period of three years.